**T. BROWN CONSTRUCTORS, INC., Appellant,**

v.

**Federico PENA, Secretary of Transportation, Appellee.**

No. 96–1147.

United States Court of Appeals, Federal Circuit.

Dec. 31, 1997.

Rehearing Denied March 2, 1998.

Douglas Seegmiller, Douglas Seegmiller Law Offices, Albuquerque, NM, argued for appellant. Of counsel on the brief was Gregory D. Huffaker, Jr., Huffaker, Barnes & Conway, P.C., Santa Fe, NM.

Elizabeth W. Newsom, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for appellee. With her on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director,

Kirk T. Manhardt, Assistant Director and Steven J. Gillingham, Attorney. Of counsel was John M. Rippley, Deputy Regional Counsel, U.S. Department of Transportation, Federal Highway Administration, of Lakewood, CO.

Before NEWMAN, PLAGER and RADER, Circuit Judges.

PLAGER, Circuit Judge.

T. Brown Constructors, Inc. ("Brown") appeals from a decision of the Department of Transportation Board of Contract Appeals ("Board") in DTBCA No.1986, dated August 18, 1995. We affirm-in-part and reverse-in-part.

## I. BACKGROUND

On December 4, 1984, Brown and the Federal Highway Administration ("FHWA" or "Government") entered into a contract. Under the contract, Brown was required to perform grading, drainage, and asphaltic surfacing along 4.6 miles of two-lane highway on Sunspot Road in the Lincoln National Forest, near Cloudcroft, New Mexico ("Cloud-croft project"). The work was to be completed within 200 calendar days of receipt of the notice to proceed. The contract was a fixed-unit-price, variable quantity contract in the amount of $2,739,812. The Bid Schedule was comprised of individual pay items for estimated quantities. For each pay item, appellant bid a unit price and extended that price to reflect the bid for the entire estimated quantity. The work was to be performed in accordance with the standard Federal Acquisition Regulation clauses applicable to construction contracts, the "Standard Specification for Construction of Roads and Bridges on Federal Highway Projects, FP–79 (Revised edition—June 1981)" ("FP–79"), the Special Contract Requirements ("SCR"), which amended FP–79, the plans, and the Bid Schedule.

Subsequently, by letter dated August 1, 1986, Brown's attorney asserted that Brown was entitled to additional compensation for extra work related to (1) a differing site condition, i.e., clay in the quarry, (2) an overly restrictive subgrade tolerance, (3) changes to the traffic control requirements, (4) FHWA-caused delay, (5) improper calculation by the FHWA of a "pay factor," (6) improper reduction of price for out-of-specification material, and (7) failure of the FHWA to pay Brown for individual removal of trees and stumps. Although the letter included a Contract Disputes Act ("CDA") certification, the amounts sought for each item were only estimates.

The contracting officer ("CO") responded by letter dated August 25, 1986, noting first that, despite the certification, the August 1 letter was not a claim under the CDA because the amounts were not set forth as sums certain. The contracting officer, nonetheless, addressed the merits of each issue raised and rejected all of Brown's requests. In its response, the FHWA indicated that Brown's allegations lacked supporting documentation. Brown sent another letter to the Contracting Officer on March 13, 1987, in response to FHWA's request for additional information, reiterating its position. The Contracting Officer again objected to the lack of supporting evidence but proceeded to make a final decision on each of Brown's

claims. The CO denied all of Brown's claims on December 14, 1987.

Brown promptly appealed the CO's decision to the Board. Almost six years later, following a trial on entitlement, the Board issued its decision denying substantially all of Brown's requested relief. Brown now appeals to this court from that decision.

## II. STANDARD OF REVIEW

This appeal is brought pursuant to the CDA, 41 U.S.C. §§ 601–613 (1994). Our review is therefore circumscribed. Under the CDA:

> The decision of the agency board on any question of law shall not be final or conclusive, but the decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.

41 U.S.C. § 609(b) (1994). As the statute plainly states, and as we have said before, § 609(b) means that if the Board's findings of fact are supported by substantial evidence, we will not alter them even though the record may contain evidence supporting a contrary position. *See Erickson Air Crane Co. of Washington v. United States*, 731 F.2d 810, 814 (Fed.Cir.1984). "Substantial evidence 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *United States v. General Elec. Corp.*, 727 F.2d 1567, 1572 (Fed.Cir.1984) (*quoting Consolidated Edison Corp. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). Accordingly, a contractor bears a heavy burden in demonstrating that a Board's factual findings should be overturned. *See Fruin–Colnon Corp. v. United States*, 912 F.2d 1426, 1430 (Fed.Cir.1990); *Koppers Co. v. United States*, 186 Ct.Cl. 142, 405 F.2d 554, 557–59 (1968).

■ As to questions of law, however, a Board's decision is not final or conclusive, *see* 41 U.S.C. § 609(b); *American Elec. Labs., Inc. v. United States*, 774 F.2d 1110, 1112 (Fed.Cir.1985), and thus a Board's interpretation of a contract is not binding upon this court, *see B.D. Click Co. v. United States*, 614 F.2d 748, 752, 222 Ct.Cl. 290 (1980). Nonetheless, we give careful consideration and great respect to a Board's interpretation because "legal interpretations by tribunals having expertise are helpful to us, even if not compelling." *United States v. Lockheed Corp.*, 817 F.2d 1565, 1567 (Fed.Cir.1987); *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir.1985).

## III. DISCUSSION

Road construction, in general, proceeds in several distinct steps. This case is no different. The first is the clearing and grubbing step to remove trees, brush, and other obstructions. Next, the excavation and embankment or "cut and fill" operation is performed to bring the road to the required subgrade level. This step entails cutting, or excavating, the hills and filling in the valleys with the excavated materials. Finally, the "pavement structure" is placed on top of the subgrade. The pavement structure consists of subbase, base course, and asphalt-treated or bituminous-treated material. The asphalt-treated material further consists of "host mix," also referred to as "binder," and open graded friction course, also referred to as seal. The seal is the top layer of the pavement structure. Most of these steps are implicated in the present appeal.

### A. The Materials Pit Claim

The contract required Brown to produce aggregates for the pavement structure; the aggregates were to be of a certain size. These aggregates were produced by a process of crushing raw material taken from a quarry and sifting the crushed material through an appropriate size sieve. The FHWA made the Benson Ridge Quarry available for this purpose. There was no other quarry available in the area.

Before crushing the raw material, clay and "fines" must be removed in a wasting step. Fines are small rocks, generally on the order of one-quarter inch in size. Clay must be removed because it clogs the crushing equipment and because it can put the aggregate out of specification. Wasting is accomplished

by passing the raw material over a sieve to remove the clay and fines. The higher the clay content the more raw material that is wasted in order to produce the desired amount of aggregate. Wasting is inefficient because more material must be gathered and crushed and the waste material removed.

Because the amount of clay in the raw material can have a dramatic impact on the amount of time and effort required to produce the needed aggregate, the contract included information on the clay content in the Benson Ridge Quarry. There were two tests that were performed by the FHWA on the Benson Ridge Quarry. The first was a so-called "washed sieve analysis" test. The specific purpose of this test was to determine the quality of the quarry for aggregate production in order to assist the contractor in planning and estimating the crushing operation.

The FHWA Materials Division prepared a Materials Report which contained the results of the washed sieve test on the Benson Ridge Quarry. Those test results indicated that the quarry contained 2.2% to 5.9% of material which passed through the No. 200 sieve (referred to as "minus 200" material). The test, as the Board found, "indicated very little clay in the tested material." The report also listed "NV" or no value for the liquid limit and "NP" or non-plastic for the plasticity index, both of which indicate very little clay in the quarry.

It appears that the washed sieve test was not performed according to FHWA standards in that the sample used was comprised of weathered rock taken from the face of the pit. The relevant FHWA standard provided that a test "sample should not include material weathered to such an extent that it is no longer suitable for the purpose intended." The Materials Division prepared a note, however, to alert contractors of this deviation from normal procedure. The noted stated:

The above gradations were produced by crushing in the laboratory samples of limestone rock only from the face of the quarry. None of the materials from clay seams that exist in the quarry was included in the above laboratory tests.

The Materials Division contacted the agency's project design engineer and asked him to include the note in the contract plans. This note, however, was not included in the plans as requested. Another note, prepared by the Materials Division, was included. That note simply stated that "there is clay in the vertical fracture joints and also horizontal clay seams. This material will have to be wasted to produce specification material."

The second test performed by the FHWA on the Benson Ridge Quarry, the results of which were made available to the bidders, involved taking test borings of the quarry. Seven test borings were taken from various points in the Benson Ridge Quarry. Only three of the seven (B–1, B–4, and B–7), however, were taken from the area of the quarry that was to be used to produce the aggregate. The mean average fractured limestone was 77.4 percent for the seven logs. In sum, as the Board found, the boring logs, "when read together, reported no clay at some locations and strata, very small amounts of clay in others, and unquantified amounts of clay at other locations and strata. . . ."

■ Brown's first claim is that the FHWA misrepresented the composition of the Benson Ridge Quarry by omitting the note that indicated that the washed sieve analysis was performed on a weathered sample. The Board held that the omission did not rise to the level of a misrepresentation because it was unreasonable for Brown to rely on the results of the washed sieve analysis in light of the boring logs. According to the Board, "it was unreasonable for [Brown] to have expected to obtain in production the same results reported in the Washed Sieve Analysis precisely because a washed sieve analysis is not representative of raw quarry material." The Board, citing *United Contractors v. United States*, 177 Ct.Cl. 151, 368 F.2d 585 (1966), reminded Brown that a "contractor must consider all of the subsurface data made available to him and may not shut his eyes to relevant information of this type."

■ A contractor can recover damages under a contract for a misrepresentation by the Government in the contract documents. *See Summit Timber Co. v. United States*, 230 Ct.Cl. 434, 677 F.2d 852, 857 (1982);

*Morris v. United States,* 33 Fed. Cl. 733, 744–47 (1995). In order for a contractor to prevail on a claim of misrepresentation, the contractor must show that the Government made an erroneous representation of a material fact that the contractor honestly and reasonably relied on to the contractor's detriment. *See Roseburg Lumber Co. v. Madigan,* 978 F.2d 660, 667 (Fed.Cir.1992); *Summit Timber, supra; Morrison–Knudsen Co. v. United States,* 170 Ct.Cl. 712, 345 F.2d 535, 539 (1965); *Restatement (Second) of Contracts* § 164 cmt. a (1979). "A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so." *Restatement (Second) of Contracts* § 162 (1979).

Brown satisfied these elements. The FHWA made an erroneous representation regarding the clay content in the Benson Ridge Quarry. The washed sieve analysis reported that the minus 200 material in the quarry was between 2.2% to 5.9%. Ted Brown, the head of the company and an experienced road contractor, testified that he personally prepared the bid and that he relied on these results in preparing his bid. The clay content was significantly higher. Even though Brown was wasting as much as 50 percent of the raw quarry material, the minus 200 material consistently pushed up against the 12% limit of the contract. Brown's records indicate a liquid limit of as much as 29 and a plasticity index of 11. This was in contrast to the "NV" or no value for the liquid limit and "NP" or non-plastic for the plasticity index on the FHWA test results. Given the disparity between what was originally reported and the amount of minus 200 material actually encountered, we conclude that the FHWA made a material misrepresentation.

■ Brown's reliance was reasonable. The washed sieve analysis test was performed to particularly identify the amount of minus 200 material in the quarry. The FHWA obviously knew that bidders would rely on this information since it prepared a note to bidders specifically to alert them to the problem with the results, a note that was not transmitted to the bidders. If it was objectively unreasonable to rely on the washed sieve analysis results, as DOT asserts, the Materials Division would not have considered it necessary to qualify the results. The existence of the borings logs does not change our conclusion. Generalizations about the composition of the quarry cannot overcome the particularized results found in the washed sieve analysis test. *See United Contractors,* 368 F.2d at 597–98.

We find it particularly ironic that the Board cited *United Contractors* against Brown to bolster its conclusion. In that case, the court held that the plaintiff could not reasonably have expected to encounter subsurface water despite the existence of a contract clause that cautioned the contractor of "high ground water" in the area and drawings that showed pools and water ditches at the site. *Id.* at 598. The court was particularly persuaded by more specific test data in the record that suggested that there was no subsurface water. In such a case, the court concluded that the more specific test data trumps the more general test results. *Id.; see also Woodcrest Construction Co. v. United States,* 408 F.2d at 411 ("We cannot say that plaintiff was wrong in following 'The most reliable and most specific indicator....' "). The same is true in this case. Accordingly, Brown is entitled to recover damages due to the FHWA's misrepresentation about the composition of the Benson Ridge Quarry; the Board's holding to the contrary is reversed.

Because we hold that, on these facts, the FHWA's conduct amounted to a misrepresentation, we need not reach Brown's alternative ground of recovery—differing site condition.

### B. The Subgrade Tolerance Claim

A roadbed is constructed by excavating and embankment, or "cut and fill" operations. Prior to placing the pavement structure on the subgrade, it is necessary to "finish" or "prepare" the subgrade. The subgrade is defined as the "top surface of the roadbed upon which the pavement structure and shoulders including curbs are constructed." Subgrade tolerance, as used in this dispute,

is the amount of variation in the subgrade plane.

Section 105.03 of the Government's standard specifications provides:

**105.03 Conformity with Plans and Specifications.** All work performed and all material furnished shall be in reasonably close conformity (see definition) with the lines, grades, cross sections, dimensions and material requirements shown on the plans or indicated in the specifications.

The specifications further define "reasonably close conformity" as "reasonable and customary manufacturing and construction tolerances where working tolerances are not specified." The contract specification also required that 75 percent of the top 18 inches of the subgrade be comprised of material no larger than three inches in diameter. The remaining 25 percent could consist of larger material provided it could be placed in "smooth layers not exceeding 8–inches."

The plans and specifications for the project did not provide a specific tolerance for finishing the earth subgrade, before placing the sub-base aggregates. Brown accordingly assumed that they would be required to finish the subgrade to plus or minus four inch rock tolerance, which Brown believed to be the "reasonable and customary ... construction tolerance" in New Mexico at the time the work was performed. As found by the Board, and not challenged by the parties, New Mexico applied a plus zero, minus 8–inch rock tolerance at the time of the contract, i.e., a variation of up to zero inches above and eight inches below the subgrade plane would be tolerated. The FHWA insisted that the subgrade be finished to a plus or minus two inch tolerance. Brown so complied and sought additional compensation for satisfying the stricter standard.

The Board concluded that it was unreasonable for Brown to assume that the eight inch rock tolerance would be applied to the subgrade plane in light of the specific requirement that the subgrade be finished with minus three inch material in the top 18 inches. The Board also held, however, that Brown's "unreasonable contract interpretation was matched by FHWA's equally unreasonable contract administration." The FHWA directed Brown to finish the road bed with material taken from excavations, the only source specified in the contract. Those excavations, however, yielded only six to eight inch rock. In order to meet the strict tolerance, Brown was required to crush this rock down to minus three size. The Board found that this constituted a change to the contract. Finding both parties partially responsible for the subgrade tolerance problem—Brown for his unreasonable bidding position and the FHWA for requiring Brown to use large rock—the Board concluded that this would be an appropriate case for both parties to share in the increased cost of finishing the subgrade to the plus or minus two inch tolerance, citing *Dynalectron Corp. v. United States,* 207 Ct.Cl. 349, 518 F.2d 594 (1975). Brown now appeals that decision.

Brown argues that its bidding position was reasonable because it expected to excavate and build the embankments in rock, or rock material, since the contract did not specify a borrow source from which the earthen fill materials could be produced nor a pay item in the bid schedule for these materials. As such, the more generous eight inch tolerance should have applied. The Board's decision, according to Brown, gives the Government a price reduction for a "changed condition," i.e., a rock substrate.

■ We agree with the Board that it was unreasonable for Brown to have assumed that the eight inch tolerance applied when the contract required Brown to finish the top 18 inches of the subgrade with predominantly minus three inch material. Had such material been available Brown would have been required to finish the subgrade in the manner specified by the contract. The fact that such material was not available does not change Brown's obligation under the contract. Only when the FHWA insisted that Brown use the excavation materials did the FHWA run afoul of the contract. In such a case, we agree with the Board that both parties should assume responsibility.

■ A contract should be interpreted, if possible, to give effect to all provisions. *See Fortec Constructors,* 760 F.2d at 1292. An interpretation which renders portions of

the contract meaningless, useless, ineffective, or superfluous should be eschewed. *See United Pacific Insurance Co. v. United States*, 204 Ct.Cl. 686, 497 F.2d 1402, 1405 (1974); *Restatement (Second) Contracts* § 203(a) (1981). The Board's reading of the contract gives effect to all parts of the contract and provides fair compensation to Brown for performing under the contract. Brown's reading, in contrast, renders the finishing requirement ineffective because it would by implication permit the use of greater than three inch material. At the least, the difference between the contract's specific filling requirement for the top 18 inches and the general "reasonably close conformity" requirement at least created a patent ambiguity, about which Brown had a duty to inquire. *See Fortec Constructors*, 760 F.2d at 1291. Brown's failure to do so precludes its proffered interpretation. *See Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 998 (Fed. Cir.1996). Accordingly, we cannot say that the Board's decision on this point was arbitrary, capricious, or not supported by substantial evidence; it is affirmed.

### C. The Tree and Stump Claims

 With regard to the area to be graded for the road, it would be necessary to remove the standing timber, and then any stumps (and other remaining obstructions) would have to be cleared. With regard to those parts of the construction area outside the roadbed areas, the Forest Service contemplated removal of the larger trees as part of a timber sale, but did not necessarily require the removal of remaining stumps.

The contract with Brown was written to require that, within the construction area, Brown would clear and grub all trees and stumps, except that, in areas outside of the grading limits, stumps could not be more than six inches above the ground. Section 201.03.[1] The contract specifically noted that the Forest Service was conducting a sale of the timber within the construction limits of the project, and that all trees larger than nine inches in diameter would be cut and removed during the timber sale, which would occur prior to the date that construction was to begin. Section 201.02.[2] Brown adjusted its bid accordingly.

On October 19, 1984, the Forest Service awarded a contract to a third party for harvesting the larger trees within the construction limits of the project. The trees to be harvested under this contract had a minimum diameter of nine inches, the same size as that specified in subsection 201.02. However, the stumps which were to be left by the third party contractor were to be no higher than 12 inches, which differed by six inches from that specified in subsection 201.03(2). Brown was later required to cut the stumps left by the Forest Service contractor to the six inch height specified by the FHWA contract. Brown sought compensation for the extra stump trimming, which was denied.

The Board held that it was unreasonable for Brown to assume that the stumps left by the Forest Service contractor would be cut to the height specified by Brown's contact with FHWA. Brown should have anticipated that additional work would have been required, according to the Board, because Brown was responsible for clearing and grubbing the area after the timber contractor was finished.

It is undisputed that FHWA expressly warranted that all trees within the construction limits of the project which were larger

---

1. Subsection 201.03 provided that:

 Clearing and Grubbing. All surface objects and all trees, stumps, roots and other protruding obstructions, not designated to remain, shall be cleared and/or grubbed, including mowing, as required, except as provided below:

 \* \* \* \* \* \*

 (2) In areas outside of the grading limits of cuts and embankment areas, stumps and non-perishable solid objects shall be cut off not more than 6 inches above the ground line or low water level.

2. Section 201.02 provided that:

 The Forest Service is conducting a timber sale prior to the date that the construction will begin on this project. All trees larger than 9 inches in diameter and located within the construction limits of this project will be cut and removed during the timber sale. It will be the responsibility of the Contractor [Brown] to remove any remaining trees, brush, slash, etc. and perform the remaining clearing and grubbing as required by subsection 201.03.

than nine inches in diameter would be cut and removed prior to the start of construction. The question then is whether the warranty was breached when the stumps of these trees were not cut to the six inch height specified in Brown's contract. The Board concluded that it was unreasonable for Brown to have assumed that the logging contractor would be required to cut the stumps to the height specified in Brown's contract because the logging operation was governed by a separate contract.

We cannot agree. The only contract to which Brown was a party indicated that the Forest Service would arrange to cut and remove all trees larger than nine inches. Under the contract, Brown was responsible for cutting and removing all other trees, where permitted leaving stumps no more than six inches high. In light of this provision, we interpret the express warranty to include the obvious inference that the Forest Service, with regard to its responsibility to cut and clear, would ensure that no stumps higher than six inches would be left. Since the Government admits that the logging contractor left stumps greater than six inches in height, which Brown was required to remove, the Government breached its express warranty.

We therefore reverse the Board's denial of Brown's entitlement to compensation for the trimming of stumps, and remand for a determination of quantum. On remand, Brown should be given an opportunity to further develop the evidence necessary to prove its damages. See S.W. Electronics & Mfg. Corp. v. United States, 228 Ct.Cl. 333, 655 F.2d 1078, 1088 (1981) (in cases in which "responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision.") (quoting Electronic & Missile Facilities, Inc. v. United States, 189 Ct.Cl. 237, 416 F.2d 1345, 1358 (1969)).

The contract also provided, in 201.04, for the removal by Brown of individual trees and stumps in areas other than those designated for clearing and grubbing. Brown was to be paid on either a "unit basis" or a "square foot basis" for the individual removal of trees. Under either basis, the diameter of the individual tree was to be measured at 54 inches above the ground.

After much of the clearing and grubbing work was complete, on August 1, 1995, Brown, through its attorney, asserted for the first time that it had been required to remove a substantial, but unspecified, quantity of trees with diameters larger than nine inches throughout the entire project. To substantiate its claim, Mr. Brown directed Mr. Alan Staehlin, a Brown superintendent, to survey a 2.7 acre area that had been logged but not cleared and grubbed to determine the tree density. Mr. Staehlin counted 400 stumps with diameters of nine inches or greater. Those stumps measured 748.53 square feet. Mr. Staehlin then extrapolated those results to arrive at a value representing the entire 58 acre site. Based on this data, Brown estimated that the total quantity of individual trees that it felled was 8,457 square feet. Brown sought payment for this amount at the item price for Individual Removal of Trees under subsection 201.04.

The contracting officer responded by noting that because Brown had failed to raise this issue earlier there was no way now to substantiate Brown's claim because any evidence of those trees had been eradicated by clearing and grubbing work. Brown eventually responded by stating that it was FHWA's responsibility to designate and measure trees covered by the Individual Removal of Trees Pay Item and that it could not escape liability by failing to fulfill its obligation. The contracting officer denied Brown's claim. Brown appealed to the Board.

The Board found that Brown failed to give the Government timely notice concerning the existence of the disputed trees throughout the project area and that such failure prejudiced the Government. The prejudice was due to the fact that the trees had been removed before the FHWA was able to quantify them. Rather than rule in the Government's favor on this ground, however, the Board instead placed a higher burden of persuasion on Brown to prove its claim. Under this standard, the Board held that Brown largely failed to carry its burden.

In particular, the Board found Brown's evidence unreliable. The Board questioned the accuracy of Brown's extrapolation on three grounds. First, the evidence of the size of the trees was unreliable because the size was measured at a height of six inches from the ground rather than the specified height of 54 inches as required by the contract. Second, Brown's survey extrapolated over the entire 54 acres even though a portion of that area was consumed by the old roadway where no trees existed. Third, and more significantly according to the Board, was the fact that the results failed to distinguish between those trees felled by Brown and those felled by the timber contractor.

The Board did find that Brown's evidence was corroborated to a limited extent based on the testimony of the FHWA's Assistant Engineer and inspector, Mr. Parea, whose knowledge the Board imputed to the contracting officer. Based on his testimony, the Board found that Brown was entitled to be compensated for the reasonable cost of clearing 22 trees with diameters larger than nine inches. The Board denied Brown's claim for compensation at the Individual Tree Removal rate, however, and instead compensated Brown under the Changes clause.

■ Brown argues on appeal that the Board erred by requiring Brown to give the Government notice per the contract's Changes Clause. *See* 48 C.F.R. § 52.243–4 (1996). The disputed work, according to Brown, is work specified by the contract. As such, there is no requirement for Brown to give notice. The FHWA's failure to track Brown's performance was a breach of the contract for which the FHWA should be held responsible, not Brown.

The Government counters by arguing that the contract explicitly excluded the removal of large trees. The Government points to the notice in the contract that informed "contractors not to include any amount in their bids for clearing larger than 9 inch trees." Brown, according to the Government, is not requesting payment for performance authorized under the contract but rather for work that has not been agreed upon. This is a change to the contract for which notice is required.

■ We agree with the Government. We further agree with the Board that the appropriate course in this case is to apply a higher burden of persuasion rather than deny the claim outright. *See Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1392 (Fed.Cir.1987) ("[T]he existence of prejudice resulting from the dilatory notice usually serves to increase the burden of persuasion facing the contractor asserting its claim for equitable adjustment rather than to bar its claim entirely.").

■ Brown relies almost exclusively on the survey as evidence of the number of trees that it had to remove. As noted by the Board, however, the survey failed to distinguish between those trees felled by Brown and those by the timber contractor. Essentially, Brown's position is that, as far as the contract is concerned (in particular subsection 201.04), a stump is a tree. Thus, according to Brown, its survey was adequate to prove its claim even though it did not distinguish between stumps and trees. We disagree. Stump trimming is not tree cutting. Because this assumption underlay Brown's survey, it alone does not provide substantial evidence to prove the claim. The only portion of the claim that is supported by substantial evidence is, as the Board found, the 22 trees. That part of the Board's decision is affirmed.

## D. The Delay Claim

■ The contract required work to be completed in 200 calendar days of receipt of the notice to proceed. A constraint was that the open graded friction course, or seal, could only be applied when the ambient temperature was at least 60 degrees. Mr. Brown, in preparing his bid, was aware that this latter constraint could pose a problem given the altitude (9000 feet) of the project. Moreover, at that altitude, the rainy season begins on about July 4 and continues through September. The winters are also colder and longer than at lower elevations.

On March 11, Brown submitted a performance schedule that included several critical performance dates. Most significant for the present dispute is that Brown estimated that

the crushing operation would take place during the period of May 6 through July 19. Included in this period was two weeks of "slack time" or "throw away days." The slack time notwithstanding, Brown was unable to perform according to schedule. The notice to proceed was issued on April 22, 1985. Brown finally began crushing on June 10, 1985—five weeks later than planned. The Board found that the Government was not responsible for Brown's late start, and Brown does not challenge that finding on appeal. The project was not completed before the end of the 1985 construction season. Work was formally suspended on November 23, 1985; the only work left to be completed was the application of the open grade friction course, which could only be done under certain ambient temperature conditions. The suspension was lifted on June 17, 1986, and the contract was completed as of June 20, 1986. Even though Brown's performance ran into the next construction year, it completed the project in only 185 days.

Brown alleged before the Board that the Government was entirely responsible for its inability to complete the contract within the 1985 construction season. In particular, Brown alleged that the imposition of the overly stringent subgrade tolerance, the differing site conditions at the Benson Ridge Quarry, and an alleged change to the traffic control requirements pushed Brown's performance into the next construction season. It therefore sought compensation for the costs of demobilizing for the winter suspension and for remobilizing in the 1986 construction season, as well as the cost of idle equipment during the winter suspension.

While the Board acknowledged that a contractor can recover "the costs of extended performance due to Government-caused delay," citing, *inter alia, G.M. Shupe, Inc. v. United States,* 5 Cl.Ct. 662, 699 (1984), the Board found that the Government was not the proximate cause of Brown's delay. Rather, the Board found that Brown itself was responsible for its own delay. In particular, the Board cited to Brown's late start and the early onset of weather as the principal causes of Brown's performance extending into the next season.

To prove its claim for damages allegedly due to Government-caused delay, "the contractor has the burden of proving the extent of the delay, that the delay was proximately caused by Government action, and that the delay harmed the contractor." *Wilner v. United States,* 24 F.3d 1397, 1401 (Fed.Cir.1994) (*in banc*). Moreover, when both parties contribute to the delay "neither can recover damage, unless there is in the proof a clear apportionment of the delay and the expense attributable to each party." *Coath & Goss, Inc. v. United States,* 101 Ct.Cl. 702, 714–15 (1944). With these principles in mind we consider Brown's contention.

Even assuming Brown is correct that the Government is to blame for the above-identified delays, Brown cannot prevail. Brown originally estimated that crushing would take 11 weeks (i.e., May 6 through July 19). Built into that estimate was two weeks of "slack time." The Board found that during the relevant time period that work was suspended due to weather for a little over three weeks (i.e., 15.5 work days). In addition, the Board found that equipment problems added another two and one half weeks (i.e., 12.5 work days). Thus, the crushing operation, without considering any Government caused delay, required a total of at least 14.5 weeks.

Brown admits that it did not start crushing in earnest until the end of June 1985 when the primary crusher arrived. Even without any Government-caused delay the crushing operation would have taken until approximately September 19, 1985. Once the crushing was complete a few days were still required to lay the open graded friction course. This is consistent with Brown's position on appeal that, assuming no Government-caused delays, it could have "crush[ed] and place[d] all of the open friction course by the end of September 1985."

The Board found that September 27 was the latest date in 1985 that Brown could have applied the open graded friction course because of the temperature restriction. Brown does not challenge that finding on appeal. The Government then could only be responsible for delaying Brown for the period of September 19 through September 26, approximately one week. Even were we to

assume that the Government was in fact responsible for this delay for any or all of the reasons asserted by Brown, we agree with the Board that the Government is not the proximate cause of Brown's damages given Brown's five week delay in starting and the delay due to weather and equipment problems. At the very least, the two parties' delays are inseparable. The Board's denial of the delay claim was correct.

### E. The Pay Factor Claim

The contract required that the subbase, base material, hot mix and open graded friction materials would be subjected to gradation tests. During gradation testing, the material is passed through a stack of progressively smaller sieves. The amount passing through each sieve is then measured to determine the relative composition of the material. The specification further specifies the percentage mixture, plus or minus an allowable deviation, for each sieve size. ·

The contractor's pay for the material was a function of the gradation test results. The higher the statistical quality level, as measured by the gradation test results, the higher the contractor's per unit price. The per unit price was arrived at by multiplying a base rate by a so-called "pay factor." The pay factor was linked to the statistical quality of the material and ranged from a low of 0.75, resulting in a 25 % reduction in price, to a high of 1.05, yielding a 5 % premium for the contractor. The manner in which the pay factor was arrived at is the source of the present claim.

In practice, the FHWA performed gradation tests of five sublots taken from a given lot of material. For each sublot, the FHWA computed a pay factor for each sieve size. The pay factors for each sieve size were then averaged to produce the arithmetic mean for the five sublots. To determine the overall pay factor for the lot, the FHWA not surprisingly selected the lowest of the mean pay factors. Brown objected to this methodology. Instead, Brown thought that the mean pay factors should be further averaged to produce an average pay factor, which would more accurately represent the overall quality of the lot. The FHWA responded by asserting that it does not make "engineering sense" to average the pay factors because each is a separate statistical measurement of quality.

The Board concluded that the contract was patently ambiguous on this point, and that Brown's failure to inquire before performing precluded his requested relief. Alternatively, the Board held that Brown could not prevail even if the contract was only latently ambiguous because Brown did not rely on its interpretation when bidding the contract.

 On appeal Brown argues that the Board improperly relied on an old version of the Government's specification to create the patent ambiguity. This older version did use more than one pay factor—one for the deviation and another for the range. Brown, however, fails to address the other independent basis for the Board's decision—lack of reliance. Brown admits that the contract permits a separate pay factor for each sieve and further that only one pay factor is used for each lot. Since the contract is silent, according to Brown, on the method of how the single pay factor is produced there is a latent, if not patent, ambiguity. In order for Brown to prevail on its claim it must have relied on its interpretation when bidding the contract. See Fruin–Colnon, 912 F.2d at 1430 ("This rule of law is well settled."). And yet the Board found that it did not. This finding is virtually unassailable since it is based on an assessment of Mr. Brown's credibility. See Planning Research Corp. v. United States, 971 F.2d 736, 741 (Fed.Cir. 1992). Accordingly, we affirm the Board's decision on this issue.

### CONCLUSION

For the reasons stated, the Board's decision regarding Brown's claim that the FHWA misrepresented the conditions at the Benson Rock Quarry is reversed. The Board's denial of the Government's liability on the stump removal claim is also reversed. The Board's decisions on Brown's remaining claims, however, are affirmed. The decision of the Board is therefore

*AFFIRMED–IN–PART, REVERSED–IN–PART, and REMANDED.*

COSTS

Each party to bear its own costs.