# United States Court of Appeals for the Federal Circuit

2007-1276

INTERNATIONAL TECHNOLOGY CORPORATION,

Appellant,

v.

Donald C. Winter, SECRETARY OF THE NAVY,

Appellee.

Peter B. Jones, Jones & Donovan, of Newport Beach, California, argued for appellant.

David M. Hibey, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for appellee. With him on the brief were Jeanne E. Davidson, Director, and Deborah A. Bynum, Assistant Director.

Appealed from: Armed Services Board of Contract Appeals

Administrative Judge Jack Delman

# United States Court of Appeals for the Federal Circuit

2007-1276

INTERNATIONAL TECHNOLOGY CORPORATION,

Appellant,

v.

Donald C. Winter, SECRETARY OF THE NAVY,

Appellee.

———————————————

DECIDED:  April 18, 2008

———————————————

Appeal from the Armed Services Board of Contract Appeals in no. 54136, Administrative Judge Jack Delman.

Before LINN, DYK, and MOORE, Circuit Judges.

Opinion for the court filed by Circuit Judge DYK.  Circuit Judge Moore concurs in the result.

DYK, Circuit Judge.

This case involves a claim for breach of a cost-plus-fixed-fee contract for treatment of contaminated soil at a Navy facility in Stockton, California.  The contractor, International Technology Corporation ("ITC"),[1] seeks to recover additional soil treatment expenses incurred by a subcontractor, Terra Kleen Response Group, Inc. ("TK"),

---

[1]  ITC filed a chapter 11 bankruptcy petition on January 16, 2002.  The subcontractor in this case, Terra Kleen Response Group, Inc., was authorized by order of the bankruptcy court to act on behalf of ITC's creditors in pursuing ITC's request for equitable adjustment.

because of unexpectedly high concentrations of clay in the treated soil. The Armed Services Board of Contract Appeals ("Board") held that ITC was not entitled to an award of costs and also determined that ITC was not entitled to damages for breach of the contract.  We affirm.

BACKGROUND

I

ITC was awarded a cost-plus-fixed-fee contract on February 23, 1994, by the Department of the Navy.  The contract was for environmental remediation services designed to remove pesticides and related chemicals at a variety of contaminated sites. The contract did not describe the services to be performed, but instead provided that services would be specified in a series of subsequent delivery orders.  Because the contract was awarded on a cost-plus-fixed-fee basis, the contract contained the "Limitation of Cost" provision of Federal Acquisition Regulation ("FAR") 52.232-20, 48 C.F.R. § 52.232-20.  Pursuant to this clause, "the estimated cost shown in the contract constitutes a ceiling on the government's contractual liability," which can only be increased if the government modifies the cost ceiling.  Advanced Materials, Inc. v. Perry, 108 F.3d 307, 310 (Fed. Cir. 1997).  In the absence of such a modification, "the contractor is not required to continue performance or incur costs that exceed those estimated in the contract."  Id.  The Limitation of Cost clause also contains a notice provision, requiring "that the contractor notify the government in writing when it anticipates that within the next sixty days it will exceed seventy-five percent of the estimated cost and provide a revised estimate."  Id.

The delivery order relevant to this case, Delivery Order number 102 ("the DO"), was issued by the government on August 29, 1997. It called for treatment of pesticide-contaminated soil at the Naval Communication Station in Stockton, California. The DO also provided that the period of performance was September 1, 1997, through September 30, 1998, and stated an estimated cost, for purposes of the Limitation of Cost clause, in the amount of $1,228,409.[2] On approximately April 17, 1998, ITC awarded a fixed-price subcontract to TK to perform the soil treatment at the Stockton worksite.

TK had developed a solvent extraction technology for the removal of certain contaminants, including the pesticide DDT, from contaminated soil, and had earlier demonstrated its technology in a small-scale pilot soil treatment program at the Stockton worksite itself. The solvent extraction technology works by dissolving certain contaminants from the soil into a solvent in sealed treatment bins. The solvent is then drained and filtered to remove the contaminants, so that the solvent can be reused. Two reports, entitled Terra Kleen Solvent Extraction Technology Evaluation Report ("Solvent Technology Report") and Focused Feasibility Study for DDT-Contaminated Soil ("Feasibility Study"), prepared by a third-party contractor, discussed and evaluated the results of TK's pilot treatment program. TK provided technical input used in the preparation of both reports.

The Solvent Technology Report and the Feasibility Study were not prepared pursuant to the government contract involved here. However, the DO briefly referenced these reports. One section of the DO presented a series of "specific tasks" the

---

[2] The total estimated cost was substantially increased, and the time for

contractor should perform, each followed by descriptive paragraphs. The first of these tasks was entitled "Examine Existing Documents." It directed the contractor to "[e]xamine the following documents:" and then listed the Feasibility Study and the Solvent Technology Report. Appellant's Supplemental App., tab 2, at 5. This provision also contained the following note: "The contractor is not required to provide written responses to these documents. Examining these items will assist the contractor in preparing the plans described in task 2 of this delivery order." Id. [3]

A key focus in this case has been the content of the two reports, and in particular what they represented about the clay content of the soil at the site. The Solvent Technology Report described the Stockton site, TK's solvent extraction technology, the procedures used, and the results of the pilot study. A single, one-page figure in this report, Table 2-15, entitled "Soil Characteristics," presented characteristics for nine soil samples taken from the site during the pilot treatment program, including the classification of the soil type for each and the percent of sand, silt, clay, and gravel in each. For the nine samples, the clay content figures reported in Table 2-15 were: 6%, 7%, 9%, 9%, 9%, 9%, 11%, 10%, and 8%. TK's President and CEO, Alan Cash, was present and observed the manner in which at least six of these soil samples were collected. The Solvent Technology Report also indicated:

> Solvent extraction cycles took much longer than expected due to the reduced [soil] permeability, thereby increasing treatment time and cost. . . . The soil also tended to form clay lumps when compacted. This

---

performance extended, by a series of contract modifications.
        [3]      The referenced "task 2" called for preparation of three plans, a "construction workplan," a "contractor quality control plan," and a "site specific health and safety plan." Appellant's Supplemental App. at 6. The four subsequent steps called for further planning meetings, preparation of a schedule, treatment of the soil, preparation of a closure report, and documentation of the process through photographs.

resulted in the formation of soil aggregates which were difficult to saturate with solvent, resulting in less particle contact and lower DDT removal efficiencies.

Appellant's Supplemental App., tab 1, at 3-4.

The Feasibility Study compared the relative merits of several alternative methods for treatment or disposal of the contaminated soil at the Stockton site, including use of TK's solvent extraction technology. The appendix of the Feasibility Study included a number of tables reporting analyses of samples of the contaminated Stockton soil before and after TK treated the soil in the pilot program. These tables referenced the soil composition, and indicated that some samples had a majority of clay, that is, substantially higher clay content than the figures in the Solvent Technology Report. It is unclear whether the samples reported in the Feasibility Study were the same as the samples reported in the Solvent Technology Report.

Pursuant to its subcontract with ITC, TK used its solvent extraction technology to treat the soil at the Stockton worksite. However, TK experienced problems in treating the contaminated soil. In a progress report to the government dated February 2, 1999, ITC noted that processing of the first increment of soil had been delayed, and attributed the delay in part to higher than expected levels of clay in the soil. TK took samples from soil in its treatment bins and from the stockpile of untreated contaminated soil for independent laboratory analysis of clay levels. The clay levels indicated for these samples ranged between approximately 23.2% and 28.8%, considerably higher than the clay content for the nine samples listed in the Solvent Technology Report, though less than some samples described in the Feasibility Study.

All work under the DO at the Stockton site, including demobilization, was completed during the week of June 26, 2000. The government accepted the project as complete on June 30, 2000. During its performance under the subcontract, TK first made ITC aware of the problems associated with clay in March 1999, but submitted to ITC a request for equitable adjustment based on the high clay content of the soil for the first time on November 15, 1999.

II

Although ITC had not provided compensation to its subcontractor, on its claim for an equitable adjustment, on January 3, 2001, ITC made a formal request to the government for an equitable adjustment, seeking compensation to cover TK's claim for equitable adjustment under the subcontract. In November 2001, ITC revised its claim to request $965,347 for expenses under the subcontract, and an additional $216,188 for ITC's own expenses, apparently representing ITC's efforts to investigate and substantiate TK's claim. The Contracting Officer ("CO") issued a final decision denying ITC's claim on February 28, 2003. The CO concluded that ITC was not entitled to any equitable adjustment under the contract, because the cost would exceed the total cost under the Limitation of Cost clause, and ITC had not followed the notice procedures under that clause or obtained a modification to cover these expenses before incurring them.

ITC appealed this determination to the Board. After a hearing, the Board issued a decision, dated July 20, 2006, denying ITC's appeal. The Board found that ITC's requested adjustment would exceed the cost ceiling of the Limitation of Cost clause and concluded that ITC had not met its burden to prove either that it complied with that

clause's requirement to notify the government before exceeding the cost ceiling, or that ITC was excused from doing so because the cost was unforeseeable. The Board also concluded that ITC would not be excused from providing the notice required by the Limitation of Cost clause just because the costs associated with TK's request for equitable adjustment were uncertain and subject to ITC's investigation at the time ITC first became aware of them.

Finally, the Board rejected ITC's alternative argument that the government had breached the DO by inaccurately describing the clay content of the contaminated soil at the Stockton site. First, the Board determined that neither the Solvent Technology Report, the Feasibility Study, "nor any DO provisions generally warranted soil content or soil conditions at the Stockton sites, nor warranted a low clay content of the soil. Indeed, both reports, when read as a whole, reflect information showing that certain soil samples were of relatively high clay and silt content." J.A. at 27. The Board also concluded that TK could not have been misled about the soil conditions because TK "earlier treated the soil from these same sites in the pilot study," and the Solvent Technology Report "indicated that TK had difficulties with low permeability of soil and with the clay at the sites at that time." Id. The Board determined that a breach claim requires, among other things, a showing of "government culpability" and concluded that ITC had not made such a showing:

> Misrepresentation in the contractual context constitutes a knowing or negligent untrue representation of fact or failure to disclose, requiring proof of government culpability beyond showing a mere variation between conditions stated in the contract and those actually encountered. [ITC] failed to make a case of misrepresentation on this record.

Id. at 28 (citing Foster Constr. C.A. v. United States, 435 F.2d 873, 880-81 (Ct. Cl. 1970)).

ITC timely appealed the Board's decision, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10). We review legal conclusions of the Board, including its construction of contract provisions, without deference, and accept its factual determinations "unless they are 'fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.'" England v. Contel Advanced Sys., Inc., 384 F.3d 1372, 1377 (Fed. Cir. 2004) (quoting E.L. Hamm & Assocs. v. England, 379 F.3d 1334, 1338 (Fed. Cir. 2004)).

## DISCUSSION

When this case was before the Board, ITC sought to recover TK's additional costs (and its own related costs) as a cost under the contract. The Board rejected this claim because ITC had not complied with the notice and approval provisions of the Limitation of Cost clause. We do not understand ITC to challenge this holding on appeal. In any event, the Board was correct that ITC cannot recover under a cost theory because of ITC's failure to comply with the notice provisions of the Limitation of Cost clause.

ITC instead urges on appeal that it has a valid pass-through claim for breach of contract. ITC asserts that the government inaccurately represented the site conditions in the DO and that TK relied on this representation in bidding on the subcontract. ITC contends that it is liable to TK under the fixed price subcontract and that the government is liable to ITC on a pass through basis. ITC does not argue that it reasonably relied

upon and was misled by any representation in its cost-plus-fixed-fee contract with the government.

I

A pass-through claim allows a prime contactor to assert against the government a claim for harm caused by the government to a subcontractor where the subcontractor could hold the prime contractor liable for that harm. "In a pass-through suit, a prime contractor that is liable for damages sustained by its subcontractor may bring claims against the government on behalf of the subcontractor." Metric Constructors v. United States, 314 F.3d 578, 581 (Fed. Cir. 2002). See generally John Cibinic, Jr. et al., Administration of Government Contracts 676-77 (4th ed. 2006) (describing pass-through claims and the Severin doctrine that governs the allowance of pass-though claims). If the prime contractor is liable "to the subcontractor for the damages sustained by the latter[]" caused by the government's action, the prime contractor can "show injury to it from the government's action," and there is no basis for the government to object to the subcontractor's claim due to lack of privity. E.R. Mitchell Constr. Co. v. Danzig, 175 F.3d 1369, 1370 (Fed. Cir. 1999). A typical example of a pass-through claim is a claim by a subcontractor, under fixed-price prime and sub contracts, for government-caused delay that resulted in increased indirect overhead costs for the subcontractor. See id. at 1370-72.

None of the cases called to our attention, however, deals with pass-through claims similar to the claim asserted here. ITC's pass-through theory in this case presents a number of difficulties, including (1) whether a subcontractor pass-through claim can be based on representations appearing in the prime contract and (2) whether

the Limitation of Cost clause limits the prime contractor's ability to assert a pass-through claim based on breach of the subcontract. We need not decide these issues, for we conclude that ITC would not prevail in this case even if all of these issues were resolved in its favor.

II

ITC contends that the government breached the DO by incorrectly representing the amount of clay in the contaminated soil, and that TK relied on this representation to its detriment in formulating its subcontract bid. ITC explains that the DO referenced the Solvent Technology Report, which in turn reported significantly lower clay content for certain soil samples than the clay levels that TK actually encountered in the contaminated soil while performing under the subcontract. Mr. Cash testified that he relied on the clay content figures in Table 2-15 of the Solvent Technology Report in preparing TK's subcontract proposal, and TK's proposal stated that "Terra-Kleen has assumed that the contaminated soil contains an overall clay content of less than 10% clay." J.A. at R4 202.19.

A misstatement as to site conditions in a government contract can support a claim for breach of contract. See Hollerbach v. United States, 233 U.S. 165, 172 (1914). The same requirements apply whether the contractor asserts such a common law breach claim or a Type I claim under the Differing Site Conditions clause, a clause which is common in government construction contracts, but was not included in ITC's contract with the government.[4] Compare T. Brown Constructors, Inc. v. Pena, 132 F.3d

---

[4] The Differing Site Conditions clause differentiates two distinct types of differing site condition claims: Type I claims, which involve "subsurface or latent physical conditions at the site which differ materially from those indicated in [the]

724, 728-29 (Fed. Cir. 1997) (listing elements for common law breach claim) with Renda Marine, Inc. v. United States, 509 F.3d 1372, 1376 (Fed. Cir. 2007) (listing elements for Type I differing site conditions claim). See also P.J. Maffei Bldg. Wrecking Corp. v. United States, 732 F.2d 913, 919 (Fed. Cir. 1984) (applying the same analysis to a common law breach claim and a Type I differing site condition claim).

In order to prevail on such a site conditions claim, a contractor must establish four elements. First, the contractor must prove that a reasonable contractor reading the contract documents as a whole would interpret them as making a representation as to the site conditions. See Renda Marine, 509 F.3d at 1376 ("[A] contractor must first prove, as a threshold matter, that the contract contained some identification of the conditions to be encountered at the site."); H.B. Mac, Inc. v. United States, 153 F.3d 1338, 1345 (Fed. Cir. 1998) (explaining that the court "place[s] itself into the shoes of a reasonable and prudent contractor and decide[s] how such a contractor would act in interpreting the contract documents"). This is a question of contract interpretation reviewed de novo on appeal. H.B. Mac, 153 F.3d at 1345.

Second, the contractor must prove that the actual site conditions were not reasonably foreseeable to the contractor, with the information available to the particular contractor outside the contract documents, i.e., that the contractor "reasonably relied" on the representations. Renda Marine, 509 F.3d at 1376 ("[T]he contractor must demonstrate that the conditions encountered were not reasonably foreseeable in light of

---

contract," and Type II claims, which involve "unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract." 48 C.F.R. § 52.236-2(a); see also Renda Marine, Inc. v. United States, 509 F.3d 1372, 1376 (Fed. Cir. 2007) (differentiating Type I and Type II differing site conditions).

all information available to the contractor when bidding[ and] that the contractor reasonably relied upon its original interpretation of the contract."). This issue is factual in nature, and review is deferential. See id. at 1378.

Third, the contractor must prove that the particular contractor in fact relied on the contract representation. See id. at 1376. Again, this is a fact issue reviewed under a deferential standard. See id. at 1378.

Fourth, the contractor must prove that the conditions differed materially from those represented and that the contractor suffered damages as a result, which is again a fact question. See id. at 1376.[5]

We conclude that the contractor here cannot satisfy either the first or second of these requirements.

---

[5] The Board held that a showing of government culpability was also required, relying on a series of decisions by the Court of Claims. See Foster Constr. C.A., 435 F.2d at 881 ("Some degree of Government culpability—either untruth or such error as is the legal equivalent—must . . . be shown, and the plaintiff's burden of proof is not satisfied merely by proof of a variation between the subsurface conditions as stated in the contract and as encountered."); C.W. Blakeslee & Sons, Inc. v. United States, 89 Ct. Cl. 226 (1939); Midland Land & Improvement Co. v. United States, 58 Ct. Cl. 671 (1923). The government has declined to defend this holding, and we are skeptical that such a showing is required. More recently, when this court listed the elements of a claim for misrepresentation in a government contract in T. Brown Constructors, Inc. v. Pena, 132 F.3d 724, 729 (Fed. Cir. 1997), we did not list any element of government culpability. Under the general law of contracts, essentially the same elements as those listed in the text above are required to establish a misrepresentation claim, and no showing of culpability is required if the representation was material. See Restatement (Second) Contracts, ch. 7, topic 1, introductory note. As discussed below, a similar approach, which also requires no showing of government culpability, applies in the context of government contract claims under the Differing Site Conditions clause. See Renda Marine, 509 F.3d at 1377. In light of our disposition of this case, however, we need not reach the issue of whether government culpability must be established.

A

We note first that ITC was required to demonstrate that a reasonable contractor would read the contract documents as representing that the contaminated soil contained less than ten percent clay. See Renda Marine, 509 F3d at 1376 (citing H.B. Mac, 153 F.3d at 1345; P.J. Maffei, 732 F.2d at 916). There cannot be a differing site condition "unless the contract indicated what that condition would be." Comtrol Inc. v. United States, 294 F.3d 1357, 1363 (Fed. Cir. 2002) (concluding that "[b]ecause the contract made no specific representation as to the type of soil to be encountered, it cannot be said that [the contractor] encountered conditions materially differing from those specifically indicated in the specification"); see also T. Brown, 132 F.3d at 729 (requiring proof of the government's erroneous representation as an element of a misrepresentation claim). This issue is subject to de novo review, based on how a reasonable contractor would interpret the contract documents as a whole:

> Determining whether a contract contained indications of a particular site condition "is a matter of contract interpretation and thus presents a question of law," which we decide de novo. We also have stated that a proper technique of contract interpretation is for the court to place itself into the shoes of a reasonable and prudent contractor and decide how such a contractor would act in interpreting the contract documents.

H.B. Mac, 153 F.3d at 1345 (internal citation omitted) (quoting P.J. Maffei, 732 F.2d at 916).

Under the Differing Site Conditions clause, we have on a number of occasions specifically considered whether reports of subsurface soil conditions at particular test or boring sites could be relied on by a reasonable contractor as an indication of the soil conditions that would be encountered. For example, in Renda Marine, this court held that a dredging contractor could not rely on a set of subsurface boring reports indicating

only soft, not stiff, clays. 509 F.3d at 1376-77. These borings only reported conditions for soil located substantially further underground than the soil that the contractor was to dredge, and the contract documents also included boring reports from other nearby locations indicating stiff clays at the proper depth. Id. at 1376-78; see also Renda Marine, Inc. v. United States, 66 Fed. Cl. 639, 657-58, 687-88 (2005). Likewise, in Comtrol, this court held that contract documents stating "[h]ard material . . . may be encountered" did not represent that only hard material would be encountered. 294 F.3d at 1362.

ITC has not shown that, in light of the contract documents as a whole, the clay composition levels listed in Table 2-15 of the Solvent Technology Report were an indication or representation of the clay content of the contaminated soil stockpile.

The contract itself did not state that the contractor could rely on the representations appearing in the reports, or in particular on the soil composition data they provided. Instead, as discussed above, the only mention of the Solvent Technology Report in the DO was in the first task, which merely directed the contractor to read the Solvent Technology Report and the Feasibility Study. The DO did not even refer to the soil content analysis in Table 2-15 of the Solvent Technology Report, but rather suggested only that reading the two reports would assist the contractor in preparing a construction workplan, a quality control plan, and a site specific health and safety plan.

Moreover, the language of the Solvent Technology Report itself suggests that Table 2-15 was not intended as, and would not have been reasonably interpreted as, a representative report on the overall composition of the contaminated soil. While the

Solvent Technology Report indicated that one of its purposes was to "[d]ocument soil characteristics," Appellant's Supplemental App., tab 1, at 1-9, it did not suggest that the reported soil composition test results were intended to be representative of the overall average clay content of the contaminated soil stockpile at the Stockton worksite. Rather, the Solvent Technology Report indicated that these test results were intended to identify the range of soil types that were actually treated in the pilot study. Soil sample "[l]ocations were selected based on visual observation of the soil types (such as fines or sand). Samples were selected to obtain a mixture of soil types representative of the soils to be treated during the pilot-scale treatability study." Id. at 4-4.

So too, the soil composition data reported in the Focused Feasibility Study reflected the presence of amounts of clay substantially exceeding ten percent. As the Board concluded, this data would have prevented a reasonable contractor from interpreting the contract documents as indicating that only a low level of clay was present in the overall soil stockpile. The Feasibility Study described a variety of soil samples and rated some as "CL." As the Board noted, a designation of "CL" was particularly significant because this designation "meant that the majority of the weight of the soil sample was clay." J.A. at 18. Two samples reported in Table A-8 of the Feasibility Study were designated as "CL," i.e., they were composed of a majority of clay. Although Mr. Cash testified at trial that he did not rely on these soil composition descriptions because he did not consider the manner in which they were evaluated to

be reliable, the Board explicitly rejected his testimony as based on hearsay and "not credible." Id. [6]

Finally, section three of the Solvent Technology Report, which evaluated TK's technology, clearly stated that "[a] soil composed primarily of silt and clay," such as some of the samples the Feasibility Study reported at the Stockton site, "may not be suitable for solvent extraction because of the excessive time required to perform the necessary number of solvent extraction cycles to remove DDT." Appellant's Supplemental App., tab 1, at 3-4. [7] This description should have been a warning to a

---

[6] ITC urges that T. Brown controls this case, suggesting that this case and T. Brown involve nearly indistinguishable facts. We do not agree. In T. Brown, this court found that a reasonable contractor could rely on more specific information in the contract documents (there a "washed sieve" test indicating low clay content of soil) rather than more general information in the boring logs. 132 F.3d at 729. Critically, nothing in any boring log at issue in T. Brown revealed the presence of an amount of clay greater than that elsewhere represented. Even the aggregate boring log figures (including areas of the quarry that were not to be used) did not show a specific amount of clay. As we stated, "[i]n sum, as the Board found, the boring logs, 'when read together, reported no clay at some locations and strata, very small amounts of clay in others, and unquantified amounts of clay at other locations and strata. . . .'" Id. at 728; see also In re T. Brown Constructors, Inc., 95-2 BCA (CCH) ¶ 27,870, at 138,979-80 (DOT BCA Aug. 18, 1995). In this case, however, the Feasibility Study indicated a majority of clay for some samples, and thus contradicted the data in Table 2-15 of the Solvent Technology Report for other samples. Given this direct contradiction, we conclude that a reasonable contractor would not have relied exclusively on the Solvent Technology Report to conclude that the contaminated soil would contain less than ten percent clay.

[7] In this regard, the Solvent Technology Report explained as follows:

The primary difficulty encountered at NCS Stockton was the low permeability of the soil. Removal of DDT from soils containing a large quantity of fine particles was extremely difficult. Particle size analysis indicated silt and clay levels in the soil ranged from 24 percent to as high as 63 percent by volume. The solvent extraction cycles took much longer than expected due to the reduced permeability, thereby increasing treatment time and cost. A soil composed primarily of silt and clay may not be suitable for solvent extraction because of the excessive time required to perform the necessary number of solvent extraction cycles to

---

reasonable contractor that permeability problems might prevent the effective use of TK's extraction technology.

Accordingly, we cannot conclude that a reasonable contractor would have read the contract as representing that the soil would contain less than ten percent clay based only on the nine soil sample compositions reported in Table 2-15 of the Solvent Technology Report.

B

Even if we could conclude that the Solvent Technology Report represented that the clay content of the soil stockpile would be less than ten percent, ITC must also show that "the conditions encountered were not reasonably foreseeable in light of all information available to [TK] when bidding[ and] that [TK] reasonably relied upon its original interpretation of the contract." Renda Marine, 509 F.3d at 1376; see also T. Brown, 132 F.3d at 729 (common law inaccurate representation claim requires showing that "contractor honestly and reasonably relied on" government's inaccurate representation).

We review the question of whether a contractor reasonably relied upon a representation as a question of fact. See Renda Marine, 509 F.3d at 1378. Reliance is

---

remove DDT. The soil also tended to form clay lumps when compacted. This resulted in the formation of soil aggregates which were difficult to saturate with solvent, resulting in less particle contact and lower DDT removal efficiencies. This was a particular problem with the soil at the base of the treatment tank.

The low permeability of the soil also significantly increased treatment time and energy costs because providing adequate energy to the soil to vaporize the solvent was extremely difficult.

Appellant's Supplemental App., tab 1, at 3-4—3-5 (internal citation omitted).

unreasonable when a contractor has reason to doubt the accuracy of a representation, such as knowledge of a flaw in the information underlying the representation. For example, in H.B. Mac, logs of underground borings made about three hundred yards from the site where an underground tank was to be constructed were too far away from the site to be reasonably relied upon because expert testimony indicated that visible surface conditions at the worksite would have alerted a reasonable contractor to the likelihood of highly variable subsurface conditions. 153 F.3d at 1347.

The Board's determination here that TK could not have reasonably relied on any representation that clay content would be below ten percent is supported by substantial evidence. TK in this case had reason to question the clay content figures in Table 2-15 of the Solvent Technology Report because it was aware of a flaw in how those test samples were obtained. TK's President and CEO, Alan Cash, testified at trial about the manner in which the soil samples reported in Table 2-15 of the Solvent Technology Report were collected. His testimony demonstrates that TK had actual knowledge that these samples were collected only from the immediate edge of the large soil stockpile and did not include any samples from deeper within the soil stockpile.

Mr. Cash testified that at the time the soil samples described in Table 2-15 of the Solvent Technology Report were taken, the contaminated soil stockpile at the Stockton worksite was piled so that three originally separate stockpiles of contaminated soil from different locations at the facility were placed together, in adjoining piles, with a diagram indicating which portion of the stockpile originated from each of three original sites. "[T]he stockpile looked like an enormous conical pyramid with three smaller peaks." Tr. at 1-197. Mr. Cash testified that he was present when an employee of another

contractor took the soil samples reported in Table 2-15.  Mr. Cash explained that the samples were collected by taking a series of random scoops of contaminated soil from the outside perimeter of each subpart of the overall stockpile (corresponding to the three original contaminated sites).  He also explained that all of the samples were taken from the outer surface of the stockpile, because at the time there was no equipment at the site to enable boring or sampling the contaminated soil deeper inside.

Mr. Cash's testimony provided no basis for an inference that these samples could be expected to be representative of the soil deeper inside the stockpile.  He relied exclusively on the randomness of the sampling as the basis for its reliability; however, his own testimony makes clear that the samples were not random with respect to the whole soil stockpile, but only with respect to its perimeter.  The absence of random sampling throughout the stockpile was particularly important because, as Mr. Cash explained, clay is often not evenly distributed through subterranean soil at a site but instead is often found in underground soil in a concentrated clay layer called a lens.

Significantly, TK itself did not use this surface sampling methodology to test the clay content of the soil during its performance under the subcontract.  Mr. Cash testified that when TK took soil samples to evaluate the clay content of the soil it was actually treating, during its performance under the subcontract with ITC, it took these samples by boring at varying depths into the soil inside its treatment bins, rather than just at the surface, and that it did so to test whether a concentrated area of clay was present in a particular area inside the bin.

TK could not have reasonably relied on any representation as to the clay content of the soil because it knew that, due to flaws in the sampling methodology underlying

2007-1276                                        19

Table 2-15 of the Solvent Technology Report, that table actually revealed nothing at all about the soil toward the middle of the stockpile.

## CONCLUSION

We affirm the Board's determination because we conclude that ITC has not established that there was any representation in the contract documents as to the clay content of the overall stockpile of contaminated soil and, alternatively, because ITC has failed to establish that it would have been reasonable for TK to rely on any such representation under the circumstances.

## AFFIRMED

## COSTS

No costs.

MOORE, Circuit Judge, concurs in the result.