ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
                                           )
Diversified Construction of Oklahoma )    ASBCA No. 59527
                                           )
Under Contract No. W44W9M-14-P-0186 )

APPEARANCE FOR THE APPELLANT:      Mr. Brad Latham
                                                  Treasurer/Secretary

APPEARANCES FOR THE GOVERNMENT:    Raymond M. Saunders, Esq.
                                                  Army Chief Trial Attorney
                                                  MAJ Michael G. Pond, JA
                                                  Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE THRASHER

This appeal arises from a three-week contract for commercial grass-mowing services at McAlester Army Ammunition Plant, McAlester, Oklahoma. Appellant, Diversified Construction of Oklahoma (Diversified), alleges that after submitting a quote with a price breakdown, the government called and informed Diversified that its quoted per-acre rate was too high and that less resources would be required to complete the work than proposed, thereby requiring appellant to reduce its per-acre rate. Diversified was unable to complete all of the mowing required during the period of performance and the contract price was reduced accordingly. Diversified seeks to recover payment of the difference between the awarded rate and its originally quoted higher per-acre rates. The Board has jurisdiction of the appeal under the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. We decide entitlement only.[1]

## FINDINGS OF FACT

1. On 2 June 2014, Army Contracting Command–Rock Island (government) issued Solicitation No. W44W9M-14-T-0155 (solicitation), a request for quotations for interim grounds maintenance at the McAlester Army Ammunition Plant (MCAAP) (R4, tab 5 at 56-58).[2] The solicitation provided the contract would be a

---

[1] The record consists of the Rule 4 file and the transcript of the hearing. Per agreement between the parties at hearing, tabs 19, 23 and 24 were constructively removed from the Rule 4 file.

[2] All Rule 4 file citations are to the consecutively numbered pages.

firm-fixed-price (FFP) contract with a three-week performance period, 9-30 June 2014 (*id.* at 58). Quotes were due no later than 4 June 2014 (*id.* at 56).

2. On 3 June 2014, the contracting officer's representative (COR), William Smedley, provided Diversified's representative, Mr. Pat Warner, with detailed schematic drawings of various areas of the installation. These drawings indicated which areas were to be mowed under the contract, and designated each such area. The drawings also included a legend which listed each area's acreage and how often it was to be mowed under the contract (e.g., weekly, bi-weekly, monthly). (R4, tab 3 at 25-38) Mr. Warner also spoke with CORs Smedley and Don Chapman requesting their advice on the project. Both advised Mr. Warner that extra equipment would be required, i.e., two tractors, two bush hogs, two lawn mowers, eight weed eaters. (Tr. 43-44)

3. Mr. Warner forwarded the map by email to Mr. Brad Latham, Diversified's Project Manager and Treasurer/Secretary, on 3 June 2014, stating in part, "[t]he grass is very high and will take a lot of equipment and labor to get this under control" (R4, tab 3 at 24). An hour later Mr. Latham sent an email to Ms. Darla Lott, the contract specialist responsible for this acquisition, expressing his concerns about the challenges of providing a quote, stating in pertinent part:

> Attached is the drawing that I was given to work from. I just wanted to make sure this is correct. This seems like more area than the quantities provided to us.
>
> Also, with the conditions being as bad as they are, and the mobilization cost our first month cost could be twice as much as subsequent months. If I am only guaranteed one month I will have to have a very high rate just in case I only have the contract one month.
>
> Looking at the numbers and assuming the wage rate (which I haven't received yet) the cost for the first month will be no less than $70,000 and will probably be around $80,000, and subsequent months being no less than $40,000. If we had a longer guaranteed time I could distribute the cost over several months to reduce the monthly rate. The other option would be to pay more the first month and I could reduce subsequent monthly costs. I don't know what your contract options are here. The bottom line is that if I am required to give a flat rate based on the options in front of me I can't get any lower than $70,000.

I'm just trying to get you as much info as possible to help you decide if we would or would not be a viable option, so that you can look elsewhere if required.

We want to help as much as we can, but after talking to Pat, and seeing this map the amount of work here is probably more than you want to spend. Attached is a simple breakdown so that you can see where I am coming from. Thanks.

(*Id.*)

*Site Visit*

4. The solicitation incorporated FAR 52.237-1, SITE VISIT (APR 1984), which provided:

> Offerors or quoters are urged and expected to inspect the site where services are to be performed and to satisfy themselves regarding all general and local conditions that may affect the cost of contract performance, to the extent that the information is reasonably obtainable. In no event shall failure to inspect the site constitute grounds for a claim after contract award.

(R4, tab 5 at 75)

5. Later on 3 June 2014, after providing Mr. Warner with the drawings referenced above, the government afforded Mr. Warner a site visit to allow him to view the areas to be mowed. Mr. Warner accompanied Ms. Lott and Mr. Chapman on the site visit. Mr. Warner brought the map to the site visit but did not view the whole area. In fact, the site visit only lasted about five minutes because Mr. Warner, after viewing the first area, said he had seen enough. The height of the grass, which was overgrown at that time, was plainly visible during appellant's site visit. (Tr. 17-19)

*Independent Government Estimate (IGE)*

6. The IGE was prepared by Mr. Andrew Scherman, employed in the MCAAP Department of Public Works. Mr. Scherman explained in detail during his testimony how he developed the IGE. The IGE was derived from historical 12-month performance IGEs dating back to 2006. The three-week requirement was calculated by taking the existing 12-month IGEs and adjusting for various factors which resulted in an IGE of $41,000 for the three-week period of performance. (Tr. 31-33, 37-38)

*Discussions/Negotiations*

7. Later in the afternoon of 3 June 2014, following the site visit, Diversified submitted an initial quote by email to Ms. Lott in the amount of $89,796.00 with an accompanying cost breakdown[3] (R4, tab 15 at 130). The cost breakdown included the amount of equipment recommended by Mr. Smedley, Mr. Chapman and Mr. Warner (tr. 43). The initial quote was substantially higher than the IGE. After reviewing the quote with Mr. Scherman, who prepared the IGE, Ms. Lott communicated to Mr. Latham that the quote was too high (tr. 20). Mr. Latham and Ms. Lott's recollections of their further discussion differ at this point. Mr. Latham testified that during their discussion Ms. Lott "instructed me not to listen to Pat [Warner] or William [Smedley] or Don Chapman.... So that was what I revised my cost breakdown to show one tractor, one [bush] hog, one mower and three weed eaters." (Tr. 44) Ms. Lott testified that she did tell Mr. Latham not to seek Mr. Smedley or Mr. Chapman's advice because they were outside the solicitation process; she thought it was inappropriate for Mr. Latham to seek advice on a bid from government personnel (tr. 13). She also testified she did not remember recommending specific numbers of equipment (tr. 16).

8. That same day, 3 June 2014, Diversified revised its quote downward from $89,796.00 to $52,314.24 (R4, tab 5 at 56-58). The email from Mr. Latham transmitting the revised bid stated:

> Darla,
>
> Please see our attached filled out bid for the mowing as described on the map provided to us. I know you guys think we are too high, but I checked all of the quantities against means, and according to the means book[4] we are

---

[3] The breakdown referenced to is not in the record.

[4] Both parties refer to the Means Book. *RsMeans* is a commercial estimation database used by professional estimators for current labor, materials and overhead costs for specific types of projects and locations. *See* http://www.rsmeans.com.

actually cheaper than we should be by about $500.00. I
just can't get any lower. Thank you for the opportunity.

(R4, tab 5 at 54) Ms. Lott asked Mr. Scherman to review the revised bid in light of the IGE. Mr. Scherman testified that although Diversified's revised quote of $52,314.24 exceed the IGE by $11,000, he nevertheless concluded it was fair and reasonable for three reasons: the price of gasoline had increased slightly; a contractor might not realize the same efficiencies in a three-week period of performance as it might in 12 months; and the annual IGEs were based upon the assumption the grass had been mowed recently, which clearly was not the case here. Based upon these considerations, Mr. Scherman advised Ms. Lott that Diversified's price, though substantially higher than the IGE, was fair and reasonable. (Tr. 36-38)

9. The government awarded Diversified the contract (No. W44W9M-14-P-0186) later that day, 4 June 2014 (R4, tab 1 at 4). Diversified performed work during the contractually required period of performance but on 2 July 2014, Mr. Latham, sent an email to Ms. Lott, in which he conceded that they had failed to fully complete the mowing required under the contract (R4, tab 5 at 58, tab 7 at 87). The parties stipulated the work that was completed was performed in accordance with contract requirements (tr. 52-53).[5]

10. On 9 July 2014, Diversified submitted a claim in the amount of $58,143.79. The stated basis for the claim is as follows:

> Attached is the email and breakdown that I sent to
> Darla Lott explaining my bid breakdown before the
> contract was awarded. Also attached is the actual
> breakdown that she received from me. I am unsure if she
> intentionally or unintentionally mislead me but after I sent
> this email to her she specifically told me on the phone not
> to listen to the individuals that advised me on the amount
> of equipment, manpower, fuel and supervision needed to
> complete the work and shown in the attachment, but that
> less resources would be required to complete the contract.
> Based upon her experience with these contracts, our trust

---

[5] The parties stipulated that the government prepared a performance work statement (PWS) for this contract but, due to an administrative oversight, the PWS was never provided to Diversified. They also stipulated that there is no dispute between the parties related to performance of the PWS and all work completed by Diversified was completed in accordance with the objective standards set forth in the PWS.

5

in Army Contracting, and our lack of experience in ground maintenance contracts we reduced the amount of resources in our bid, and therefore reduced our per acre mowing cost. The cost per acre for the awarded price was not fair and reasonable, and Army contracting did or should have known that the rate was too low, yet we were told that the number was fair and reasonable. As you know the grass on the base had not been maintained and took a tremendous amount of time and effort to complete.

By your and others own admission the individuals working the contract performed well. Additionally the equipment performed exceptionally. There is no way to say that we lost money on this contract due to a lack of performance or negligence on our part. It is the direct responsibility of contracting for talking me into and misrepresenting what a fair and reasonable cost for the work performed is. It is the responsibility of the contracting office to do business in an ethical fair way, and the reason we are in a dispute now is not from a lack of performance on our part, but instead poor contract administration on the Army contracting office's behalf.

As you can see our original estimate provided to the government was for $89,796.00. This cost is 70.8% higher than what I was told that I needed to do the project for. This also means that the per acre price for the mowing should have been for 70.8% more money.

Based on the mowing completions signed off on by the COR and based on what the dollar amount should have been per acre our claim is for $34,042.03 + 70.8% which is $58,143.79[.]

(R4, tab 15 at 130)

11. On 14 August 2014, the contracting officer (CO) issued a final decision denying appellant's claim for $58,143.79, but stated the government was prepared to pay appellant $34,042.03 for work performed (R4, tab 18 at 138-39).

12. On 29 August 2014, Diversified filed a notice of appeal with the Board challenging the CO's final decision (COFD), and requesting payment in the amount of $24,101.76, the difference between its claim and the amount the CO agreed to pay.

6

DECISION

It is uncontroverted that the contract was an FFP contract and that appellant did not complete all the work under the contract (findings 1, 9). However, appellant asserts it should also recover the difference between the awarded contract price and the price it submitted in its original bid for the work completed, which is 70.8% higher than the contract price (compl. at 2). Appellant asserts that the government representative misled it during negotiations regarding the resources necessary to complete the contract, given the overgrown site conditions and "instructed" appellant to ignore the advice it received. Consequently, appellant relied upon the misrepresentations to revise, and eventually agree to, rates that were too low to complete the contract or make a profit. (App. br. ¶¶ 4-7) We understand appellant's argument to be that it is entitled reformation of the contract based upon the government's alleged misrepresentations. To prevail on a claim of misrepresentation, appellant must prove both: (1) an erroneous representation of material fact by the government; and (2) reasonable reliance by the contractor. *Robertson & Penn, Inc.*, ASBCA No. 55622, 08-2 BCA ¶ 33,921 at 167,859 (citing *Holmes & Narver Constructors, Inc.*, ASBCA Nos. 52429, 52551, 02-1 BCA ¶ 31,849 at 157,395), *aff'd*, 57 F. App'x 870 (Fed. Cir. 2003); *T. Brown Constructors, Inc. v. Pena*, 132 F.3d 724, 728 (Fed. Cir. 1997). Appellant has failed to prove either element.

With regard to the first element, appellant has failed to prove there was any erroneous representation of material fact. Our findings establish that Ms. Lott's negotiating position, that appellant's initial bid was too high, was based upon the IGE (finding 7). Mr. Scherman testified in detail how he developed the IGE (finding 6). To the extent Ms. Lott's negotiating position was that appellant's bid included too much equipment and labor, there was no misrepresentation of a material fact; she was relying upon her advisor's IGE.[6]

With regard to the second element, we conclude appellant could not have reasonably relied upon any government representations concerning the amount of equipment or labor required to complete the job.[7] Appellant's initial bid reflected

---

[6] By quoting on the solicitation, appellant was holding itself out as a responsible contractor with the expertise to perform the content. *J.N. Futia Co.*, ASBCA No. 34672, 89-2 BCA ¶ 21,800 at 109,697. Estimating the mowing equipment needed to perform was part of the expertise appellant was to bring to bear in this matter. We perceive no overreaching by the government.

[7] Given we have concluded appellant's reliance upon the government IGE was not reasonable, we need not address appellant's arguments that the government did not consider various factors in its IGE that are required by FAR 15.406-1, PRENEGOTIATION OBJECTIVES (app. br. ¶¶ 1-3).

7

appellant's due diligence; Mr. Latham reviewed the requirements, sought the advice of two CORs, and received advice from one of his own experienced employees who conducted the site visit (findings 2, 3). The advice Mr. Latham received was consistent; the grass was overgrown and would require more equipment and labor than on most jobs (finding 2). Mr. Latham submitted the bid and then was informed by the government representative, Ms. Lott, that the bid was too high. Mr. Latham and Ms. Lott then entered into negotiations. Mr. Latham testified that during the negotiations Ms. Lott instructed him not to listen to the advice provided by the two government employees or appellant's own employee.[8] As a result of this instruction, Mr. Latham testified he substantially revised the bid to reflect the use of less equipment and manpower (finding 8). We do not find it credible that Mr. Latham would disregard his own evaluation of the cost of the job, the advice of three experienced people and a site visit that indicated a higher bid because he was instructed by Ms. Lott to ignore his due diligence. In addition, appellant's final, lower bid was the product of Mr. Latham's own research not any misrepresentations by the government. His email forwarding the revised bid reflects he independently re-evaluated his bid before revising it. (Finding 8)

To the extent appellant argues it could not meet its contractual obligations due to the height of the grass, those conditions were plainly visible during appellant's site visit. Appellant had the responsibility to consider this factor when developing its proposal. *Optimum Services, Inc.*, ASBCA No. 58755, 15-1 BCA ¶ 35,939 at 175,656 (contractor charged with knowledge of the conditions a pre-bid site visit would have revealed).

---

[8] Ms. Lott's recollections of the negotiations differs. She testified that she did instruct Mr. Latham not to seek the advice of the two government employees (CORs) because she considered it improper for a contractor to seek the advice of government employees on preparation of a bid. Contrary to appellant's account, she did not remember recommending specific numbers of equipment appellant should include in its bid (finding 7). Consequently, we find Ms. Lott's testimony more credible.

## CONCLUSION

This appeal is denied for the reasons stated.

Dated: 9 December 2015

JOHN J. THRASHER
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59527, Appeal of Diversified Construction of Oklahoma, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

9