E.R. MITCHELL CONSTRUCTION
CO., Appellant,

v.

Richard J. DANZIG, Secretary
of the Navy, Appellee.

No. 98–1483.

United States Court of Appeals,
Federal Circuit.

May 10, 1999.

Stan Barnett, Smith, Bundy, Bybee &
Barnett, P.C., of Charleston, South Car-
olina, argued for appellant.

Franklin E. White, Jr., Attorney, Com-
mercial Litigation Branch, Civil Division,
U.S. Department of Justice, of Washing-
ton, DC, argued for appellee. With him on
the brief were David M. Cohen, Director
and James M. Kinsella, Assistant Director.

Before NEWMAN, MICHEL, and
CLEVENGER, Circuit Judges.

CLEVENGER, Circuit Judge.

This is a government contracts case. The facts are not in dispute, and the only issue for decision is one of law: whether the government is liable for unabsorbed home office overhead costs of a subcontractor, whose work is delayed by the government, when the prime contractor is not delayed in the completion of its contract with the government. The Armed Services Board of Contract Appeals held that the government is only liable for a subcontractor's unabsorbed home office overhead costs when the prime contractor is delayed by the government in performance of its contract. *See E.R. Mitchell Constr. Co.,* ASBCA No. 48745, slip op. at 6 (Mar. 17, 1998).

E.R. Mitchell Construction Co. (Mitchell) brought this suit on behalf of its subcontractor Clontz–Garrison Mechanical Contractors, Inc. (CG), and Mitchell prosecutes this appeal on behalf of CG under our review authority in 41 U.S.C. § 607(g)(1), 28 U.S.C. §§ 1295(a)(10) and 1295(b). We reverse the Board's decision.

I

Before proceeding to the merits of this appeal, we pause to consider and dispose of an issue that arose during oral argument of this case. The issue is whether this cause of action is barred by a doctrine that emanates from the "hornbook rule that, under ordinary government prime contracts, subcontractors do not have standing to sue the government under the Tucker Act ... to enforce a claim for equitable adjustment under the Contract Disputes Act of 1978." *Erickson Air Crane Co. of Wash. v. United States,* 731 F.2d 810, 813 (Fed.Cir.1984) (citations omitted). The hornbook rule is based on the proposition that the "government consents to be sued only by those with whom it has privity of contract, which it does not have with subcontractors." *Id.*

 The hornbook rule, however, is tempered to permit a prime contractor in certain circumstances to sue the government on behalf of its subcontractor, in the nature of a pass-through suit, for costs incurred by the subcontractor. *Id.* In *Severin v. United States,* 99 Ct.Cl. 435 (1943), *cert. denied,* 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1944), a prime contractor sought to recover from the government for direct field costs incurred by its subcontractor. Our predecessor court held that the prime contractor lacked standing to bring the suit, because the prime contractor could not prove in fact that it was liable to the subcontractor for the costs in suit. *See Severin,* 99 Ct.Cl. at 443. If the prime contractor proves its liability to the subcontractor for the damages sustained by the latter, then the prime contractor itself can show injury to it from the government's action. Such a showing overcomes the objection to the lack of privity between the government and the subcontractor.

*Severin* thus limited the government's exposure to such pass-through suits to the situations in which the prime contractor is liable for the subcontractor's costs. Absent such proof of prime contractor responsibility, the government retains its sovereign immunity from suit against it. The gist of these rules is known as the *"Severin* doctrine." For many years, the burden of proving prime contractor responsibility to a subcontractor, to avoid the defense of sovereign immunity, rested on the prime contractor.

 The Court of Claims in time revisited the *Severin* doctrine and shifted the burden of proof from the prime contractor to the government. Thus, it became, and still is, the burden of the government to prove that the prime contractor is *not* responsible for the costs incurred by the subcontractor that are at issue in the pass-through suit. *See Blount Bros. Constr. Co. v. United States,* 171 Ct.Cl. 478, 346 F.2d 962, 964–65 (1965); *John McShain, Inc. v. United States,* 188 Ct.Cl. 830, 412 F.2d 1281, 1283 (1969). In *Cross Construction Co. v. United States,* 225 Ct.Cl.

616, 1980 WL 13189 (1980), the Court of Claims stated:

> This court has refined the *Severin* doctrine so that it requires an iron-bound release or contract provision immunizing the prime contractor completely from any liability to the sub. . . . If the contract is silent as to the prime's ultimate liability to the sub, suit by the former will generally be permitted. . . . *Blount Bros. Constr. Co. v. United States*, 171 Ct.Cl. 478, 482–84, 346 F.2d 962, 964–65 (1965). . . . Defendant (on whom the burden rests) has not made the strict kind of case it must if we are to apply the *Severin* doctrine as it exists in today's world.

*Id.* at 618. Indeed, this court has confirmed that "application of the *Severin* doctrine has been narrowly construed." *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1552 & n. 8 (Fed.Cir.1983).

The *Severin* doctrine can only bar the prime contractor's pass-through suit against the government if the government first asserts at trial, and then proves, that the prime contractor is not liable to the subcontractor for the costs in suit. *See George Hyman Constr. Co. v. United States*, 30 Fed.Cl. 170, 177 (1993), *aff'd.*, 39 F.3d 1197 (Fed.Cir.1994) (table) (granting government's motion for summary judgment under the *Severin* doctrine where government asserted and proved lack of prime contractor liability to subcontractor for costs of pouring concrete for a sidewalk four times before government found the work acceptable).

■ Thus, when the government shoulders its burden of proof under the *Severin* doctrine, it enjoys immunity, as a matter of law, from the pass-through suit for want of privity in the circumstances. But when the government either fails to raise its *Severin*/sovereign immunity defense at trial, or raises it and fails to prove it, then the claims of the subcontractor are treated as if they are the claims of the prime contractor, and any further worry about the absence of subcontractor privity with the government is extinguished.

■ We have reviewed the full record before the Board. No mention is made in the record, or in the decision of the Board, to suggest that the government raised its *Severin*/sovereign immunity defense in this case. It is thus clear that the government waived that defense. We so hold, and therefore the government cannot raise the defense for the first time on appeal to avoid liability in this case. We may now proceed to the facts of this case, and to the decision of the legal issue before us.

## II

The government awarded a contract to Mitchell on April 27, 1992, for the construction of a clothing issue building at the Marine Corps Recruit Depot at Parris Island, South Carolina. The contract contained three phases. Phase A, for contract submittals, was to begin on May 5, 1992, with a completion date of September 2, 1992. Phase A is not in issue. Phase B, for construction of the new facility, was to begin on May 5, 1992, with a completion date of May 20, 1993. Events occurring in Phase B are at issue. Phase C, for demolition of certain facilities, was to begin on June 19, 1993, with a completion date of August 18, 1993. Phase C is not in issue.

On May 29, 1992, Mitchell entered into a subcontract with CG to perform mechanical work for Phase B of the contract in accordance with the contract drawings and specifications. CG's work included heating, ventilation, air conditioning (HVAC), plumbing, steam, exterior sanitary sewer and water distribution.

A schedule for completing Mitchell's contract with the government was developed and agreed to by Mitchell and each of its subcontractors, including CG. The schedule included separate line items for work to be completed by CG. Each plumbing and HVAC item required manpower to be furnished throughout certain windows of time, and the schedule required CG to

complete its work by March 8, 1993. This schedule, which clearly stated CG's duty to complete its work by a date certain, was approved by the Resident Officer in Charge of Construction (contract officer).

On October 8, 1992, CG notified Mitchell that the specifications and drawings to which it was bound were defective with respect to the routing of plumbing, HVAC piping, ducts, sprinkler piping, and electrical work. The government concedes that the specifications and plans were faulty and that work could not proceed until the faults were cured. From October 8 until November 27, the government considered means to correct the faults, and on December 7 the government communicated its corrective decisions to Mitchell and CG. For a period of 60 days while the government decided how to cure the contract defects, CG was essentially on standby. Although CG performed some work on the project in that period, its planned use of manpower was substantially disrupted.

As a result of the government's change in the specifications and drawings, the contractors incurred additional costs to revise the ductwork system, chilled water piping, seismic bracing and other matters. To compensate the contractors for these additional costs, the contracting officer on April 27, 1993 issued Modification No. P00037, increasing the contract price by $13,946. No objection that Mitchell was not responsible to CG for the increased costs caused by the defective specifications and drawings was raised by the contracting officer in processing the modification. The increased direct costs due to government fault were thus awarded to the contractors without objection. In accepting the modification, Mitchell expressly reserved its right to seek additional compensation for the delay caused by the contract defects, and the modification itself memorialized that reservation.

On June 11, 1993, the government declared that all work on Phase B, with the exception of punch list items, was complete in accordance with all contract terms on May 6, 1993, a few weeks in advance of the contract completion date of June 4, 1993. On June 25, 1993, CG, through Mitchell, submitted a request for an equitable adjustment for unabsorbed home office overhead incurred during the 60 days when CG was unable to proceed with the work required by its contract with Mitchell. The sum sought was $17,478.00 due to delay from October 8 until December 7, 1992. The sum was calculated by a veteran CG accountant pursuant to the formula established long ago in the celebrated *Eichleay* case. *See Eichleay Corp.*, ASBCA No. 5183, 60–2 B.C.A. (CCH) 2688, 1960 WL 538 (1960). This court, incidentally, has held that the *Eichleay* formula is the *only* means for calculating recovery for unabsorbed home office overhead. *See Wickham Contracting Co. v. Fischer*, 12 F.3d 1574, 1580–81 (Fed.Cir.1994). No question is raised in this case about the calculation of the amount of unabsorbed home office overhead being sought by Mitchell for CG. If Mitchell can recover for CG, the amount is settled at $17,478.00. The government rejected CG's request for the equitable adjustment, preferring instead to receive a formal contract claim from Mitchell. On November 7, 1994, Mitchell complied by filing a formal claim on behalf of CG for the same amount of CG's unabsorbed home office overhead costs incurred during the 60–day delay.

On March 22, 1995, the contracting officer issued a final decision denying Mitchell's claim. In the decision, the contracting officer noted that Mitchell—the prime contractor—had not been delayed in the critical path of its contract with the government, and that Mitchell had been fully compensated for its additional costs by Modification No. P00037. Mitchell duly appealed that decision to the Board by letter on May 15, 1994. After some discovery, the case was submitted to the Board for decision on briefs.

III

The Board's decision sets forth the pertinent facts, and concludes, as a matter of

law, that the unabsorbed home office overhead costs of a subcontractor cannot be recovered in a pass-through suit when the prime contractor has completed its contract on time. Since the delay in this particular contract did not affect the critical path of Mitchell's contract with the government, the Board held that Mitchell's subcontractor, CG, could not recover its *Eichleay* damages through Mitchell. The Board also noted that no contention is made in this case that Mitchell intended to complete its contract sooner than the contract-specified date, had the capacity to do so, and actually would have done so but for the government caused delay. In such circumstances, the Board, citing *Interstate General Gov't Contractors, Inc. v. West,* 12 F.3d 1053, 1056 (Fed.Cir.1993), assumed that Mitchell would have preserved its right to seek *Eichleay* damages for CG.

Mitchell timely appealed to this court. We now address the merits of the legal issue before us.

IV

■ Mitchell argues that the fact that it completed its contract on time should not stand in the way of CG's right to an equitable adjustment for its unabsorbed home office overhead incurred during the 60–day delay. Mitchell notes, without objection from the government, that if it had been unable to complete is contract on time due to government-caused delay, the government would be liable for its and CG's unabsorbed home office overhead.

Mitchell also emphasizes the proposition that there is nothing per se unusual about a subcontractor successfully recovering, through a pass-through suit, its unabsorbed home office overhead costs incurred by government-caused delay. We have approved such recoveries, *see Capital Elec. Co. v. United States,* 729 F.2d 743 (Fed.Cir.1984), as have the boards of contract appeals, *see C.E.R., Inc,* ASBCA No. 41767, 96–1 BCA 28,029, 1995 WL 645749; *A.A. Beiro Constr. Co.,* ENGBCA 5103, 91–3 BCA 24,149. Mitchell further notes that the direct costs of CG arising from the faulty government contract specifications and drawings were awarded without objection. Finally, Mitchell argues that, in this particular case, the timetable to which CG was bound was no secret to the government, and indeed the contracting officer had approved the intricate schedule for performance by Mitchell's subcontractors. Furthermore, the government was put on notice by Mitchell and CG that the government's delay was causing increased costs to the contractors. Such notice of potential government liability provided the government with an incentive to speed its curative measures. In those circumstances, Mitchell contends that it simply does not make sense to deny recovery of the undisputed amount of CG's unabsorbed home office overhead.

With regard to the legal issue at hand, the government repeats the rationale of the Board's decision: that no recovery of a subcontractor's unabsorbed home office overhead can be had unless the prime contractor has been delayed in the performance of its contract. When confronted with Mitchell's argument that in this particular case, the government knew about and approved the subcontractors' performance schedules and obligations, the government counters with its own "it makes no sense" argument. The gist of that argument is that since there is no privity of contract between the government and the subcontractor, the government is powerless to control, or to dictate, the performance schedules of subcontractors. In making this argument, the government goes so far as to cite the *Severin* doctrine, and the cases that have described the hornbook rule to which we earlier referred.

We reject the government's position. Its arguments revisit the privity issue, and its underlying considerations, which the government waived when it elected not to raise its *Severin*/sovereign immunity defense in this case. As we noted earlier, when a prime contractor is permitted to

sue on behalf of its subcontractor, the claim of the subcontractor merges into the claim of the prime contractor, because the prime contractor is liable to the subcontractor for the harm to the subcontractor caused by the government's delay. When the government fails to establish its *Severin*/sovereign immunity defense, the prime contractor is presumed to have incurred the harm caused to the subcontractor, in this case as if the prime contractor itself had been forced to stand by during the government-caused delay.

Here, the government has no complaint with permitting Mitchell to recoup the additional direct costs incurred by its subcontractor as a result of the government's fault. Aside from the privity considerations, which are inapplicable to this case, we see no reason to exclude *Eichleay* damages of a subcontractor simply because the prime contractor completed its contract on time.

We emphasize, however, that in order for the prime contractor to prevail in this kind of pass-through suit, the proofs must establish that the subcontractor has satisfied all of the requirements for entitlement to *Eichleay* damages, including the correct calculation thereof. In this case, the government does not challenge that a 60–day delay was caused by it. Because the government has not argued that CG's proofs of entitlement are deficient in any regard (other than the argument that CG's entitlement is barred by Mitchell's timely completion of its contract, which we reject), we see no reason for a remand for further proceedings.

Finally, it should be clear that our decision on the legal issue in this case is dependent on the operative facts of this case, which include the awareness and approval by the government of CG's duty to have completed its work by a date certain. Whether the result in this case will obtain in a case in which the government has no knowledge of the performance obligations of the subcontractor awaits the presentation of that case for decision.

## CONCLUSION

In this case, we reject the government's argument that timely completion of the prime contract bars, as a matter of law, an otherwise satisfactory *Eichleay* damages claim of a subcontractor in a pass-through suit properly brought by the prime contractor. Therefore, the decision of the Armed Services Board of Contract Appeals is reversed.

*REVERSED*