ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| Alderman Building Company, Inc. | ) | ASBCA No. 58082 |
| | ) | |
| Under Contract No. N40085-09-D-5321 | ) | |

APPEARANCE FOR THE APPELLANT:         Marilyn H. David, Esq.
                                                             D'Iberville, MS

APPEARANCES FOR THE GOVERNMENT:   Craig D. Jensen, Esq.
                                                             Navy Chief Trial Attorney
                                                             Genifer M. Tarkowski, Esq.
                                                             Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE YOUNGER

        In this sponsored appeal regarding a contract for the renovation and interior repair of a building, Alderman Building Co., Inc. (Alderman), seeks unabsorbed home office overhead on behalf of its electrical subcontractor relating to performance delays.  The issues are heavily fact-intensive, and we have previously denied motions for summary judgment filed by both parties.  After disposition of their summary judgment motions, the parties elected to submit the appeal on the record pursuant to our Rule 11 and supplemented the record with additional documents.  Both entitlement and quantum are before us for decision.  We sustain the appeal in part.

FINDINGS OF FACTS

        A.  *Contract and Subcontract*

        1.  By date of March 27, 2009, the Navy awarded a Task Order for supplies or services under Contract No. N40085-09-D-5321 to Alderman for renovations of the interior, repairs to building systems, and incidental related work, on building M403 at Marine Corps Base Camp Lejeune, North Carolina (R4, tab 1 at 1-7).  The Task Order provided that "[t]he entire work . . . shall be completed by 3/22/2010" *(id.* at 7).

        2.  The contract contained various standard clauses, including Federal Acquisition Regulation (FAR) 52.233-1, DISPUTES (JUL 2002); FAR 52.242-14, SUSPENSION OF WORK (APR 1984); and FAR 52.243-4, CHANGES (JUN 2007) (R4, tab 5.6 at 958).

3. By date of April 8, 2009, Alderman entered into a subcontract with Big John's Electric Co., Inc. (Big John's), for labor, equipment, materials, and supplies for specified portions of the interior repairs to the building (R4, tab 5.12 at 995). Big John's was an electrical subcontractor that performed approximately 90 percent of its work on Federal projects (ex. A-1, tab 40 ¶¶ 2-27). The subcontract provided that "time is of the essence," and that Big John's was to "begin work within 7 days after notification" by Alderman (R4, tab 5.12 at 996).

B. *Delays*

4. Approximately two months after award, by email dated May 27, 2009, the Navy directed Alderman to "[c]ontinue to get all of your submittals approved and ready to start construction and we will move the [contract completion date]" accordingly when we have a nailed down work start date" (R4, tab 5.13). We find that the Navy expected the work to be initiated with full force by all parties.

5. While the solicitation provided that the contract start date would be 10 days after award (R4, tab 5.6 at 948), we find that contract performance was characterized by repeated government-caused delays that aggregated to 263 days and pushed the start work date into February 2010. The delays were chiefly caused by the unavailability of new facilities for the existing tenants in building M403 (R4, tab 6 at 1107). The multiple delays to the start date were memorialized as follows:

| Date | Document | Start Date | Record Citation |
|---|---|---|---|
| January 13, 2009 | Solicitation | 10 calendar days after award. | R4, tab 5.6 at 948 |
| March 10, 2009 | Solicitation Amendment No. 0003 | "Work may not begin . . . until 01 June 2009." | R4, tab 1 at 21 |
| May 27, 2009 | Email, Navy project engineer to Alderman Project Manager | "Lets plan on starting" in mid-July 2009 "time period."* | R4, tab 5.13 |
| June 19, 2009 | Email, Navy project engineer to Alderman Project Manager | Afraid construction may be pushed back to August 2009. | R4, tab 5.14 |

| July 1, 2009 | Email, Navy project engineer to Alderman Project Manager | "Lets set the new start date at 15 October" 2009.* | R4, tab 5.15 |
|---|---|---|---|
| July 7, 2009 | CO Suspension Letter to Alderman | Suspension "until further notice." | R4, tab 5.16 |
| July 9, 2009 | Email, Alderman Project Manager to Subcontractors | Project start date "suspended until October" 2009.* | R4, tab 5.17 |
| September 30, 2009 | Email, Alderman Project Manager to Subcontractors | "[N]ew start date for the project is 12/15/09." | R4, tab 5.18 |
| November 18, 2009 | Email, Navy project engineer to Alderman Project Manager | "We are still on for 15 December [2009] at this point."* | R4, tab 5.20 |
| December 8, 2009 | Email, Navy project engineer to Alderman Project Manager | "[N]o earlier than the 1st of February [2010] for Starting." | R4, tab 5.21 |
| December 8, 2009 | Email, Alderman Project Manager to Subcontractors | "Project will not be starting now until February 1st [2010], at the earliest."* | R4, tab 5.22 |
| February 2, 2010 | Email, Navy project engineer to Alderman Project Manager | Some tenants not moving out "until sometime, probably after the 9th"; others will vacate on the 8th. | R4, tab 5.28 |

*Underscoring in original.

6. In his July 7, 2009 letter to Alderman, the contracting officer had advised that, pursuant to the Suspension of Work clause *(see* finding 2), "you are hereby

3

directed to suspend all work under the referenced contract," with an exception not relevant here, "until further notice." The contracting officer's cited reason was "<u>Government delays in vacating the premises.</u>" (R4, tab 5.16 at 1004) The contracting officer's notice did not contain any explicit direction to Alderman to place its work force on standby during the suspension period.

7. After the delays set forth in finding 5, above, Alderman began contract performance on February 19, 2010 (ex. A-1 at 2). Big John's began performance of its subcontract on the same date and completed work on October 28, 2010 (ex. A-1, tab 40 ¶¶ 4-5).

8. In a three-part email string dated March 17, 2010, the Navy project engineer agreed to submit Alderman's requested 270-day time extension in the contract completion date to the contracting officer (R4, tab 4.11).

C. *Claims Sponsorship Agreement*

9. By date of August 18, 2011, Alderman and Big John's executed a Claims Sponsorship Agreement (R4, tab 5.57). In the introductory paragraph of that agreement at issue here, the two parties provided:

> WHEREFORE, pursuant to the terms of the Subcontract, and this Agreement, Contractor and Subcontractor agree that the Owner is the ultimate responsible party to pay for the Subcontractor's and Contractors' claims, and further agree that it is the intent of this Agreement to reserve and preserve to Subcontractor the right to have its claims prosecuted in Contractor's name against the Owner, in accordance with this Agreement.

(R4, tab 5.57 at 1101) Consistent with that stated intent, the agreement provided in paragraph 1 that "Contractor will pay any Subcontractor's sums due Subcontractor with respect to its claims promptly upon payment to Contractor by the Owner" (*id*.). It also provided in paragraph 2(a) that "[t]he claims of Subcontractor will be included in a claim to be presented by Contractor and Subcontractor in the name of Contractor against the Owner before the Contracting Officer . . ." (*id*.).

10. We find no evidence in the record that Big John's released Alderman from liability to Big John's for any costs of performing its subcontract.

11.  By date of February 20, 2012, Alderman's president executed a final release under the prime contract providing that, in consideration of a specified sum, Alderman:

> [D]oes, and by the receipt of said sum shall, for itself, its successors and assigns, remise, release and forever discharge the Government, its officers, agents, and employees, of and from all liabilities, obligations and claims whatsoever in law and in equity under or arising out of said contract.

(Respondent's Motion for Summary Judgment and Motion to Dismiss for Lack of Jurisdiction, dated August 31, 2012, attachment A)  The release does not contain any reservation of rights by Alderman (*id.*).  In a March 13, 2015 stipulation, both parties agreed that the release does not bar this appeal (ex. A-5).

D.  *Claim and Appeal*

12.  By letter to the contracting officer dated August 18, 2011, Alderman submitted a pass-through claim for $20,518, on behalf of Big John's, for *Eichleay* damages, and for attorney fees and expenses, breach of contract, and requested a contracting officer's final decision (R4, tab 5 at 869, 874, 884).  In the course of this litigation, Dr. Seals (*see* finding 14) calculated that the correct amount of the claim should be $56,548 (ex. A-4, tab 7).  We find no evidence that the claim included an item for the direct costs of standby.  We find that the contracting officer received the claim on August 24, 2011 (R4, tab 5 at 868).

13.  By date of January 19, 2012, the contracting officer denied the claim in its entirety (R4, tab 6).  Alderman thereafter, brought this timely appeal.

14.  Alderman's position in this appeal relies heavily on the expert opinion of Roger K. Seals, Ph.D., P.E., a retired professor of Civil and Environmental Engineering at Louisiana State University.  Dr. Seals' report has multiple iterations in the record.  The version that we understand to be authoritative is his 2nd Supplemental Expert Report – Corrected Version, dated October 17, 2016.  It appears in the record as Exhibit A-27.  Unless otherwise indicated, citations to the Seals report are solely to this corrected version of the original report.

15.  We find that Dr. Seals is qualified as an expert in civil engineering.  We find no evidence, however, that he is qualified as an expert in cost accounting.

5

E. *Standby*

16. We find that, during Delay 1, which ran from June 1, 2009 to February 11, 2010, the Navy did not explicitly require Alderman or Big John's to place their workforces on standby (ex. G-5 at 174).

17. We find that it was the Navy's practice to afford Alderman and Big John's little advanced notification of the delays in the project's start dates. With his expert report, Dr. Seals included a table showing both definite and indefinite start dates for each delay (ex. A-1 at 3). Dr. Seals opined that "these notification periods were inadequate for material acquisition and re-scheduling and/or rehiring employees" (*id.* at 8). Mr. Michael Dougherty, Big Johns' project manager, agreed regarding the inadequacy of the periods with definite dates and stated that, with respect to the remaining start date notices, which were sent on May 27, June 19, and July 7, 2009:

> [T]he Navy did not even give definite, revised start-dates that [Big John's] could use for planning. Instead, the Navy gave indefinite, broad timeframes like "mid-July," "August," and "until further notice." These indefinite dates prevented [Big John's] from being able to schedule replacement work or to take its workers off of standby for the . . . job.

(Ex. A-1, tab 40 ¶ 26)

18. The Navy points to three email exchanges that are said to show that it did not require Alderman to resume work immediately and at full speed (Respondent's Cross-Motion for Summary Judgment and Response in Opposition to Appellant's Motion for Partial Summary Judgment Regarding (1) Unabsorbed Overhead Under Alternative to Eichleay Formula and (2) Standby Labor Costs, dated September 27, 2013 at 9-10). We find that none are conclusive. The first cited exchange is dated February 1, 2010 between Alderman, Big John's, and the Navy. It was, by its terms, technical in nature, initiated by the subcontractor's expression of "a few concerns with a partial turnover of the building" regarding "several circuits." (R4, tab 4.5) The second cited exchange is between the Navy project engineer and Alderman on January 28 and February 2, 2010 regarding "New Developments." It relates to arrangements to have "temp. power going before the start date," to avoid consuming time on such arrangements when work ultimately began. (R4, tab 4.6) The third cited exchange is between the project engineer and Alderman on February 1-2, 2010 regarding the cost of doing inside work while the building was partially occupied, as well as tracking "contractual impacts . . . due to the government delays [for] a revised cost proposal" (R4, tab 5.27).

6

19. By date of August 16, 2010, the Navy and Alderman executed Modification No. 03 which, in pertinent part, increased the contract performance time by 270 calendar days (R4, tab 3 at 847-48). We find that this modification, executed seventeen months after contract award (*see* finding 1), was the first time extension granted to Alderman by the Navy.

20. With respect to standby, Dr. Seals set forth his conclusion that:

> [I]t was necessary for Big John's to be prepared to commence work immediately when the delays were lifted, not as much as 7 days thereafter, because of the overriding factors of proper project coordination and prevention of liquidated damages.

(Ex. A-1 at 8)

21. Dr. Seals conceded at his deposition that he never found a document in which the Navy explicitly directed Big John's to keep its workforce on standby, ready to perform work immediately (ex. G-5 at 174). Dr. Seals also testified that Big John's kept its workforce on standby because of the Navy's failure to issue a time extension and the threat of liquidated damages:

> [T]he fact that they [Big John's] were dealing with potential for liquidated damages, the fact that they were at this point, they had no extension for the completion date and, thus, they stood . . . the possibility of liquidated damages – I think that really drove the decision making on the part of Big John's to ensure that they had standby so they could begin work immediately.

(Ex. G-5 at 175)

22. Dr. Seals' overall conclusion regarding standby as it affected Big John's was that:

> [C]ircumstances surrounding the short durations of time and indefinite new start dates after each postponement notification caused insufficient time for Big John's to take its workers off of standby status during either Delay 1 or Delay 2. I conclude Big John's keeping workers on standby was necessary and reasonable, in order to respond to the dwindling period of performance with no time extension, and due to [] other factors . . . .

7

(Ex. A-27 at 51)

23. Alderman has also tendered the affidavit of Mr. Dougherty, Big John's project manager. Mr. Dougherty's background is in "residential, commercial and light industrial construction, specifically electrical subcontracting" (ex. A-1, tab 40 ¶ 1). In this first affidavit, he noted that "the project was delayed 8 times from the original date of June 1, 2009 to February 19, 2010" (*id.* ¶ 6). With respect to the Navy project engineer's May 27, 2009 email regarding the first post-award delay *(see* finding 4), Mr. Dougherty stated that the email resulted from Alderman's request for clarification of the start date, but that the Navy "failed to give a definite date for ending the delay" (ex. A-1, tab 40 ¶ 11).

24. In his second affidavit in the record, Mr. Dougherty attested:

> 22. Throughout both delay periods [June 1, 2009 –
> February 11, 2010 and February 17, 2010 - February 19,
> 2010], Big John's planning for the Bldg. M403 work was
> hampered by important uncertainties. These included the
> availability of qualified workers for rehire when the delays
> ended, the diminishing period of performance with no
> Navy time extension, the potential for liquidated damages
> that could be imposed by the Navy since there was no time
> extension, and the Navy's pattern of issuing short-notice
> postponements which overruled each other and many of
> which had no clear or definite start-date.
>
> 23. These uncertainties were not under Big John's control.
> If Big John's were to be able to start and complete the
> work on time, then Big John's had to keep a sufficient
> workforce on standby during both delays.

(Ex. A-4, tab 45 ¶¶ 22-23)

25. Mr. Daugherty also stated, and we find, that Big John's "kept 2 workers on standby as floated or nonproductive labor during the period from 3 June 2009 to 17 February 2010" (ex. A-1, tab 40 ¶ 31). These workers "would be a full crew and would be able to commence work . . . immediately" (*id.* ¶ 33).

26. The Navy points to several emails in 2010 which it says demonstrate that it and Alderman "openly negotiated when to begin [building] M403 contract performance" (gov't br. at 13-14). We find these emails unpersuasive because, by their own terms, they reflect little to no actual negotiation. Thus, while the Navy

stated in its January 28, 2010 email that it wanted to reschedule a power outage in building M403 to February 19, 2010, and inquired whether that rescheduling would affect Alderman's schedule (*see* R4, tab 4.6), this email pertained to one of the last in a series of revisions to the contract start date (*see* finding 5). It did not occur until Delay 1 (June 1, 2009 – February 11, 2010) was almost concluded, and, in any event, the parties did not agree to the proposed February 19 revised start date. We further find that the January 28, 2010 email, as late in the performance period as it was, constituted the first time that the Navy asked Alderman about the scheduling impact of a revised start date.

27. The Navy also relies upon an email chain beginning on February 2, 2010 that is also said to show that the parties negotiated the start date for when work would begin and "therefore the Navy did not require Alderman or Big John's to resume work immediately" (gov't br. at 14). The Navy asserts that a February 2, 2010 email from Alderman requesting that the Navy reschedule the planned February 19, 2010 power outage to an earlier date, stating that Alderman "would like to get Big John's to set the pole and have the temp. power going before the start date of the project" (R4, tab 4.6; ex. A-27 at 28 ¶¶ 4-5).

28. We find that Alderman and the Navy did not reach agreement on an extension of the contract completion date until August 16, 2010, when they executed Modification No. 03 (*see* finding 19).

F. *Replacement Work*

29. We find that in the period of June 4, 2009 through February 18, 2010, Big John's bid on 28 other contracts, from which it received five contract awards in the total amount of $3,552,312 (R4, tab 5.53; ex. A-2 at 11). The Navy contends that these five contracts constituted replacement contracts, by which it means that Big John's was able to bid on this work because it was not occupied in performing the contract at issue, and that they were adequate to absorb overhead that would otherwise have been paid by this contract. The five contracts pointed to as replacement contracts are as follows:

(a) a $505,000 contract for building 118 dated June 26, 2009 (ex. A-2 at 11-13, section E; ex. A-2, attach. SR2B at 4);

(b) a $1,046,500 contract for buildings 205 and 213 dated June 29, 2009 (*id.*);

(c) a $445,000 contract for building 19 dated July 15, 2009 (*id.*);

(d) a $668,700 contract for building 730 (*id.*); and

9

(e)  a $887,121 contract for P619 Tactical Van Pad dated January 26, 2010 (*id.*).

30.  During Delay 1 and Delay 2, Big John's received a total of $147,416 under three replacement contracts on the following dates and in the following amounts:

| Date | Amount | Replacement Contract |
|------|--------|----------------------|
| January 6, 2010 | $15,070 | 19B |
| February 3, 2010 | $43,310 | 19B |
| February 22, 2010 | $89,036 | 205, 213 |

(Ex. A-2 at 11-13, section E; ex. A-4, tab 12; ex. A-4, tab 24 at 168-69; ex. A-27 at 55 ¶ 8)

31.  During Delay 1, Big John's posted actual labor charges on four replacement contracts, as follows:

(a)  on October 14, 2009, to replacement contract 213 (ex. A-2, attach. SR2B at 4);

(b)  on November 11, 2009, to replacement contract 19 (*id.*);

(c)  on November 18, 2009, to replacement contract 118 (*id.*); and

(d)  on January 6, 2010, to replacement contract 730 (*id.*).

32.  During Delay 1, Big John's submitted five invoices for a cumulative amount of $188,452 under replacement contracts, as follows:

(a)  by date of October 26, 2009, Big John's invoiced $60,000 for replacement contracts 205 and 213 (ex. A-2, attachment SR3 at 5; ex. A-2 at 11-13, section E; ex. A-4, tab 12; ex. A-4, tab 33C at 444-52);

(b)  by date of December 18, 2009, Big John's prepared an invoice for $15,070 for replacement contract 19B (ex. A-2, attachment SR3 at 5; ex. A-2 at 11-13, section E; ex. A-4, tab 12; ex. A-4, tab 36C at 651-55);

(c)  by date of  January 14, 2010, Big John's prepared an invoice in the amount of $43,310 for replacement contract 19B (ex. A-2, attachment SR3 at 5; ex. A-2 at 11-13, section E; ex. A-4, tab 12; ex. A-4, tab 36C at 656-59);

(d)  by date of  January 25, 2010, Big John's prepared an invoice in the amount of $89,036 for replacement contracts 205 and 213 (ex. A-2, attachment SR3 at 5; ex. A-2 at 11-13, section E; ex. A-4, tab 12; ex. A-4, tab 33C at 453-61); and

(e) by date of January 26, 2010, Big John's prepared an invoice in the amount of $36,036 for replacement contract 118 (ex. A-2, attachment SR3 at 5; ex. A-2 at 11-13, section E; ex. A-4, tab 12; ex. A-4, tab 31C at 318-22).

33. Big John's attributed home office overhead expenses to four replacement contracts during Delay 1, as follows:

(a) on July 15, 2009, Big John's started home office overhead for replacement contract 205 (ex. A-2, attach. SR2B at 4);

(b) on July 15, 2009, Big John's started home office overhead for replacement contract 213 (*id*.);

(c) on July 28, 2009, Big John's started home office overhead for replacement contract 19B (*id*.); and

(d) on July 30, 2009, Big John's started home office overhead for replacement contract 118 (*id*.).

34. Mr. Daugherty attested, and we find, that Big John's was unable to obtain sufficient replacement work during the delay periods to absorb the overhead that it would have realized had it been performing its subcontract with Alderman during the delay periods (ex. A-2 at 11, ¶ 2; ex. A-1, tab 40 ¶ 35).

35. Mr. Daugherty attested that "Big John's began seeking other work to perform as soon as it learned that the Building M403 job would be delayed to June 1, 2009" (ex. A-1, tab 40 ¶ 34). Mr. Daugherty summarized:

> From June 4, 2009 – February 18, 2010, Big John's submitted a total of 28 bids and received 5 contract awards for Federal jobs. . . . Big John's submitted 10 of those 28 bids during June 2009, and 10 during August and September 2009. The awards totaled $3,552,312 . . . .

(*Id*.) With respect to the process of seeking replacement work, Mr. Daugherty identified the Navy's notification policy as an obstacle to scheduling adequate replacement work. He attested that "the Navy gave very short advance notifications of when each delay was to end and work had to start" (*id*. ¶ 26; *see also* finding 5). Some notification periods, Mr. Daugherty attested, "did not allow Big John's sufficient time for acquiring materials and re-scheduling

11

and/or re-hiring employees." With respect to other notification periods, Mr. Daugherty attested that "the Navy gave indefinite, broad timeframes like 'mid-July,' 'August,' and 'until further notice.' These indefinite dates prevented [Big John's] from being able to schedule in replacement work or to take its workers off standby . . . ." (*Id.* ¶ 26) Mr. Daugherty also attested that the short notification periods posed an obstacle to Big John's' rescheduling of employees. "Re-hiring qualified employees laid off due to lack of adequate work also requires time to accomplish,' he attested, and it "cannot be accomplished during notification periods running from only 4 to 7 days, or when new definite start-dates are not provided" (*id.* ¶ 27). We find this evidence from Mr. Daugherty credible.

36. With respect to replacement work, Dr. Seals concluded:

> It is evident that Big John's was active in seeking replacement work and was successful, as measured against the company's previous bid-and-award history . . . . Despite this, the billings for replacement work were insufficient to compensate Big John's for unabsorbed [home office overhead] as calculated [earlier in his report].

(Ex. A-27 at 71)

37. We find that Big John's substantially completed its subcontract work on August 24, 2010 (ex. A-27 at 19, ¶¶ 6, 10).

38. While the Navy asserts that Big John's was "working on at least six other contracts during the M403 Contract suspension period" (gov't br. at 20), we find the Navy's contention, in and of itself unpersuasive because it does not establish that billings for these replacement contracts were sufficient to compensate Big John's for its unabsorbed home office overhead.

39. We find that, in computing the direct costs of standby labor, Dr. Seals employed an equivalent hourly rate estimate. To arrive at this rate, Dr. Seals explained that he took "the total labor cost for either floated or non-productive labor during the delay periods divided by the respective number of labor hours. These calculations yield hourly rates that are weighted averages of the actual range of labor rates." (Ex. A-27 at 79) We have found no credible evidence that Dr. Seals is qualified to render opinions regarding cost accounting issues (*see* finding 15).

G. *Contracting Officer Authority*

40. In our 2013 decision denying summary judgment, we concluded that there was an outstanding issue of fact regarding whether Meghan J. Hislop had contracting officer authority. *See Alderman Building Co.*, ASBCA No. 58082, 13 BCA ¶ 35,381 at 173,617. We now find, from the Navy's subsequent interrogatory response in the record, that, from the beginning of the contract, she had a contracting officer's warrant of $5,000,000, as well as authority over this contract (exs. A-15 at 12 n.1, A-16 at 5, A-18 at 4).

41. In our 2014 decision, we concluded that "there is no triable issue that portions of the total delay period were of uncertain duration." *Alderman Building Co.*, ASBCA No. 58082, 15 BCA ¶ 35,841 at 175,273.

## DECISION

As indicated in our findings, we have previously rendered two decisions in this Rule 11 appeal. *See Alderman Building Co.*, ASBCA No. 58082, 15 BCA ¶ 35,841 and *Alderman Building Co.*, ASBCA No. 58082, 13 BCA ¶ 35,381. In those decisions, we denied summary judgment on multiple issues of fact, concluding that their resolution must await a fuller post-trial record trial. Nonetheless, following our decisions, the parties elected Rule 11 disposition.

In this decision, we first resolve outstanding legal issues relating to a release said to bar the appeal; to the applicability of the *Severin* doctrine to the appeal; and to our jurisdiction in light of the certification of the claim. We then consider the merits of Alderman's entitlement to *Eichleay* recovery on behalf of its subcontractor, Big John's.

Alderman's lengthy complaint is in 15 counts. Styling the counts as Alderman does, we summarize the allegations regarding entitlement to *Eichleay* recovery as follows:

(a) Count I: *Ordered and Constructive Suspensions of Work.* In general, Alderman alleges that the Navy "delayed the start of Big John's work, by delaying the Notice to Proceed and by successively revising the date the job site would be available and work could start" (comp1. ¶27). Alderman then makes particular allegations regarding the delays in the start date (*see* finding ¶ 5), and alleges that the delays were unreasonable, that they were due to the Navy's convenience, and alleges entitlement to extended and unabsorbed home office overhead costs on behalf of Big John's (*id.* ¶¶ 28-46).

13

(c) Count III: *Eichleay Claim and Prerequisites.* In general, Alderman alleges that it meets the requirements for application of the *Eichleay* formula, "[e]ven with use of an alternate method of computation" *(id.* ¶79).

Alderman also alleges entitlement to recovery of unabsorbed overhead using a methodology other than the *Eichleay* formula, including the Changes clause *(id.* ¶125) and quantum meruit *(id.* ¶¶131-35).

In its present briefing, Alderman organizes its argument around the elements for *Eichleay* recovery set forth in *P.J. Dick*, *Inc. v. Principi*, 324 F.3d 1364, 1369-70 (Fed. Cir. 2003). Alderman asserts that it satisfies those elements for the two delay periods at issue, which it has denominated Delay 1 (June 1, 2009 through February 11, 2010) and Delay 2 (February 17, 2010 through February 19, 2010).

In defending against entitlement, the Navy advances three broad arguments. First, the Navy contends that we lack jurisdiction because, in the Claims Sponsorship Agreement (*see* finding 9), Alderman and Big John's agreed that Alderman is not liable to Big John's for the latter's costs, which embraces home office overhead costs incurred during the suspension period for Building M403 (gov't br. at 11-12).

Second, the Navy maintains that we also lack jurisdiction over the appeal because Alderman has not executed a proper certification of the claim (*id.* at 12). Third, addressing the merits of *Eichleay* entitlement, the Navy asserts that Alderman has failed to prove the requisite elements of either an uncertain suspension period or an extension of the time for contract performance (*id.* at 12-21).

The Navy urges that Alderman has failed to prove the merits of its unabsorbed home office overhead claim. The Navy thus stresses, first, that it did not instruct Alderman to place its workers on standby, or to begin work immediately (gov't br. at 13-15). The Navy also points out that the "time is of the essence" provision in Big John's subcontract (finding 3) does not translate into a requirement imposed by the Navy to be on standby (gov't br. at 15). The Navy further urges that its exchanges with Alderman regarding modification of the contract completion date (*see* finding 26-27) negate any claimed requirement that Alderman keep its forces on standby (gov't br. at 15-16). In addition, the Navy dismisses as irrelevant the market conditions for Big John's to hire qualified workers, rejecting Dr. Seals' conclusion that such conditions forced it to keep workers on standby and asserts that the minimal number of hours that it actually billed during February 2010 believed Alderman's standby argument (*id.* at 16-17).

14

After carefully considering the parties' submissions, we conclude that the appeal must be sustained.  We reach this conclusion for the reasons set forth below.

A. *Release*

Alderman first argues that the final release that Alderman and the Navy executed on February 20, 2012 (*see* finding 11) does not bar the appeal (app. br. at 8-9).  In our 2013 decision, we concluded on summary judgment that the motion papers raised a genuine issue of material fact regarding the finality of the release. *Alderman Building Co.*, ASBCA No. 58082, 13 BCA ¶ 35,381 at 173,618-19.  In its present brief, however, the Navy now agrees that the release does not serve as a bar.  The Navy admits that "Big John's claim is not barred by the release signed by Alderman . . . .  The Contracting Officer who discussed the release as well as the exception to the release has proper warrant and authority to preserve Alderman's rights to pursue this . . . appeal" (gov't br. at 21).

We accordingly conclude that there is no longer any issue between the parties regarding whether the release bars the appeal.  We accordingly reject Alderman's release argument as moot.

B.  *Severin* Doctrine

Invoking *Severin v. United States*, 99 Cl. Ct. 435 (1943), *cert. denied*, 322 U.S. 733 (1944), the Navy argues that the appeal must be dismissed with prejudice because "Alderman . . . avers that it is not responsible for the costs allegedly incurred by . . . Big John's" (resp. br. 11-12).  In general, the *Severin* doctrine "is based upon the principles of sovereign immunity and privity of contract.  It generally precludes a prime contractor from sponsoring a subcontractor claim against the government if the prime contractor is not liable to the subcontractor for the costs or damages in question."  *Freedom Systems, LLC*, ASBCA No. 59259, 15 BCA ¶ 36,103 at 176,266.

According to the Navy, dismissal is required "because Alderman asserts it is not responsible for the costs incurred by Big John's during the Contract suspension period" (gov't br. at 11).  The Navy focuses upon a portion of one of the introductory paragraphs of the Claims Sponsorship Agreement between Alderman and Big John's (*see* finding 9) in which the parties "agree that the Owner is the ultimate responsible party to pay for the Subcontractor's . . . claims" (gov't br. at 11).  The Navy tells us that, by this provision, Alderman "avers that it is not responsible for the costs allegedly incurred by the subcontractor," Big John's (gov't br. at 11-12).

15

In its reply brief, Alderman challenges the Navy's *Severin* argument (app. reply br. at 1-3). Alderman asserts that the Navy has not met its burden under *E.R. Mitchell Construction Co. v. Danzig*, 175 F.3d 1369, 1370 (Fed. Cir. 1999) to prove that "the prime contractor is *not* responsible for the costs incurred by the subcontractor" (emphasis in original). In *Mitchell*, the court quoted with approval the Court of Claims' decision in *Cross Construction Co. v. United States*, 225 Ct. Cl. 616, 618 (1980) that the *Severin* doctrine "requires an iron-bound release or contract provision immunizing the prime contractor completely from any liability to the sub."

We conclude that the *Severin* doctrine does not warrant dismissal of the appeal. Applying the standard articulated in *Mitchell*, we cannot say that the Navy has made the requisite showing that Alderman "is *not* responsible for the costs incurred by" Big John's. *Mitchell*, 175 F.3d at 1370 (emphasis in original). We reach this conclusion for two principal reasons.

First, we reject the Navy's argument that the cited provision of the Claims Sponsorship Agreement constitutes either an "iron-bound release or contract provision immunizing [Alderman] completely from any liability to [Big John's]." *Cross Construction*, 225 Ct. Cl. at 618. By its terms, the provision cited by the Navy does not purport to be a release. It appears in an introductory clause of the Claims Sponsorship Agreement (finding 9), not in a substantive provision. Neither this provision, nor any other part of the agreement, constitutes an express undertaking by either Big John's or the Navy to release Alderman from any obligation.

Second, in advancing this argument, the Navy disregards Alderman's unqualified undertaking in paragraph 1 of the agreement that "Contractor will pay any Subcontractor's sums due Subcontractor with respect to its claims promptly upon payment to Contractor by the Owner" (finding 9). This undertaking is the antithesis of "an iron-bound release or contract provision immunizing the prime contractor completely from any liability to the sub." *Cross Construction,* 225 Ct. Cl. at 618.

We accordingly reject the Navy's *Severin* doctrine defense.

 C. *Claim Certification*

The Navy contends that we lack jurisdiction to consider Alderman's claim until it is properly certified, inasmuch as it now exceeds $100,000 (gov't br. at 12). For its part, Alderman asserts that certification is unnecessary because the claim amount was only $20,518 when submitted to the contracting officer and, even if the amount rose during the disputes process, certification would not be required because "it is not a new claim arising from a different set of operative facts" (app. reply br. at 3). Alderman

asserts that the Navy's position is based on a factual error.  Alderman represents that its:

> [C]laim amount when submitted to the contracting officer was $20,518, due to Navy delays from [1 June 2009 into mid-February 2010]. . . .  During litigation of this appeal, Alderman's expert found the current amount of [Big John's] direct and indirect costs, due to the Navy delays, is $56,548. . . . At no time did Alderman revise the amounts arising from these operative facts (i.e., Navy delays) to reach at or above $100,000.

(App. reply br. at 3)  Alderman adds that its expert "listed his fees . . . on the same page as the claim amount," which "should not be considered" for purposes of certification (*id*.).

We accept this uncontroverted explanation, which is supported by the record. Dr. Seals' October 2013 Second Supplemental Expert Report contains the updated claim summary that reflects direct labor cost of $23,073, unabsorbed home office overhead of $33,218, and bond premium of $257, all aggregating $56,548 (ex. A-4, tab 7 at 108), the amount that Alderman recites in its reply.  On the same page, Dr. Seals adds to this amount $45,556 in interest and costs of his expert reports (*id*.). These amounts are not components of the claim and, at best, would only be recoverable as incidental costs after Alderman has prevailed on its claim.

We accordingly conclude that Alderman's claim aggregates $56,548.  Inasmuch as that amount is less than $100,000, we reject the Navy's argument that we lack jurisdiction over the appeal until it is properly certified.

D. *Unabsorbed Overhead*

In our 2014 decision, we denied both Alderman's motion for summary judgment, and the Navy's cross-motion for summary judgment, regarding the issue of Alderman's entitlement to *Eichleay* recovery.  We followed the Federal Circuit's holding in *Nicon, Inc. v. United States*, 331 F.3d 878, 888 (Fed. Cir. 2003), that *Eichleay* "is the exclusive formula for the calculation of damages for unabsorbed overhead due to a period of government-caused delay in situations in which contract performance has begun."

In applying the formula, we looked to the three *Eichleay* elements set forth in *Satellite Electric Co. v. Dalton*, 105 F.3d 1418, 1421 (Fed. Cir. 1997).  With respect to the first element, we concluded that there was "no triable issue that portions of the total delay period were of uncertain duration."  *Alderman*, 15 BCA ¶ 35,841 at 175,273. With respect to the remaining two elements – standby and replacement work -- we concluded that there were triable issues regarding whether Alderman was on standby

17

and whether it was unable to take on replacement work. *Alderman*, 15 BCA ¶ 35,841 at 175,273-74. The parties have since submitted evidence regarding these latter two elements, which we analyze below.

1. *Standby*

In our 2014 decision, we concluded that three email exchanges between Alderman, Big John's, and the Navy, as well as both the Dougherty affidavit, and the Seals report, collectively established a triable issue regarding standby. *Alderman*, 15 BCA ¶ 35,841 at 175,273-74.

Alderman now argues that indirect evidence establishes that it was on standby during both Delay 1 and during Delay 2. With respect to both delays, Alderman relies on *P.J. Dick, Inc. v. Principi*, 324 F.3d 1364 (Fed. Cir. 2003). Inasmuch as the contracting officer did not issue a written order suspending "all the work . . . for an uncertain duration and [requiring] the contractor to remain ready to resume work immediately or on short notice," *P.J. Dick*, 324 F.3d at 1371, Alderman seeks to prove standby by indirect evidence (app. br. at 11). While the Navy contends that Big John's made a business decision to keep its workers on standby, Alderman urges that the workers were on standby due to the Navy's contract administration practices, such as the lack of a time extension, the reduced work force, the remobilization time, and relief from the risk of liquidated damages (app. reply br. at 3). Alderman continues by denying the Navy's contention that there was no nexus between standby and the Navy delays, insisting that the Navy's awareness of Alderman's and Big John's unrelaxed performance obligations is an "'operative fact' driving a holding that the Navy required standby" (app. reply br. at 4). Alderman also stresses that the parties did not negotiate or agree upon the Navy's multiple revisions to the work start date (*see* finding 5), and the parties did not agree to a time extension before the delays ended (app. reply br. at 4-5). Finally, Alderman rejects the Navy's defense that the large number of hours that Big John's billed in February 2010 refutes the conclusion that the Navy kept Big John's on standby (app. reply br. at 5-6).

In its brief, the Navy stresses that, in its original suspension notice (*see* finding 6), it did not require Alderman to place its workforce on standby, and hence Alderman must demonstrate that it was required to be on standby through indirect evidence (gov't br. at 13). The Navy tells us that Alderman cannot do so, pointing to emails in 2010 that "clearly show[] that Alderman and the Navy were negotiating when to begin the M403 Contract performance" and hence the Navy did not require Alderman or Big John's to resume work immediately (*id*. at 14).

We accept Alderman's argument that it had to place its forces on standby. In reaching this conclusion, we acknowledge that the Navy did not explicitly order Alderman to place its workers – and Big John's – on standby (finding 16).

18

Nonetheless, we accept Dr. Seals' explanation, which is consistent with the other evidence of record, that Big John's kept its work force on standby chiefly because of the threat of liquidated damages and because of the absence of a time extension (finding 21). We also accept Dr. Seals' overall conclusion that, as time went on, "keeping workers on standby was necessary and reasonable, in order to respond to the dwindling period of performance with no time extension" (finding 22). Finally, we find persuasive Mr. Dougherty's outline of the "important uncertainties" facing Big John's, such as "the availability of qualified workers for rehire when the delays ended," and "the Navy's pattern of issuing short-notice postponements" (finding 24), both of which are evident from the chart in finding 5.

We accordingly conclude that Alderman has established that it was required to have its workforce on standby.

### 2. Inability to Take On Replacement Work

The parties' arguments regarding replacement work are chiefly factual. In our 2014 decision, we concluded that the parties' arguments regarding replacement work required a more fully developed record concerning the start dates (*see* finding 5) and their impact. *Alderman*, 15 BCA ¶ 35,841 at 175,274.

At the outset, the Navy acknowledges the burden shifting that takes place after we conclude, as we have, that Alderman has made a prima facie case that the Navy required Big John's to be on standby during a government-caused delay of uncertain duration (gov't br. at 18). That is, the burden shifts to the Navy to show "either (1) that it was not impractical for the contractor to obtain 'replacement work' during the delay, or (2) that the contractor's inability to obtain such work, or to perform it, was not caused by the government's suspension." *Melka Marine, Inc. v. United States*, 187 F.3d 1370, 1375 (Fed. Cir. 1999) (citing *West v. All State Boiler*, *Inc*., 146 F.3d 1368, 1376 (Fed. Cir. 1998)).

The Navy now urges that "[i]t was not impractical for Big John's to obtain replacement work during the M403 Contract suspension period" (gov't br. at 20). The Navy points to five contracts with a cumulative value of $3,552,312 that it says constitute replacement contracts that were awarded to Big John's during this period (gov't br. at 18-20). The Navy argues that Big John's suffered no loss, or should have suffered no loss, because of Navy actions, inasmuch as Big John's posted actual labor hours, submitted invoices, and received three payments, and allocated the unabsorbed home office overhead from the M403 contract to these contracts during the suspension period (*id.*).

For its part, Alderman insists that Big John's was unable to obtain sufficient replacement work to compensate for the unabsorbed overhead related to the contract

19

for the relevant period, which Alderman defines as the 192 day period from June 1, 2009 through December 9, 2009 (app. reply br. at 6).

To meet its burden, the Navy contends that it was "not impractical" for Big John's to obtain replacement work (gov't br. at 18-20). The thrust of the Navy's argument is to attack Dr. Seals' conclusions. The Navy emphasizes that it has met its burden of proof "using evidence submitted by Big John's to establish that it was not impractical for Big John's to obtain 'replacement work' during the . . . suspension period." (Gov't br. at 21)

We agree that Big John's made efforts to obtain replacement work; we have given credence to the evidence of bids that it submitted for other work in June to September 2009 (finding 35). We agree that Big John's efforts met with some success, and that it was able to take on some replacement work during the suspension period, as its billings and book entries reflect (findings 29-36, 38). But we also conclude that Big John's was unable to obtain sufficient replacement work during either Delay 1 or Delay 2 to compensate for the disruptive effect of the multiple delays. We are persuaded by Dr. Seals' analysis, as well as by Mr. Daugherty's evidence, that Big John's was frustrated in the first instance by the Navy's practice of giving Alderman "very short advance notifications of when each delay was to end and work had to start" (finding 35).

We accordingly conclude that the Navy has not met its burden regarding Big John's ability to take on replacement work.

E. *Direct Costs of Standby*

As a separate category of relief, Alderman contends that, independent of the *Eichleay* formula, it is entitled to $21,753 in direct costs of standby. Alderman tells us that "[t]hese are the costs of paying an electrician-supervisor and a licensed electrician to keep them on standby during the delays." (App. br. at 23) Alternatively, Alderman urges that these amounts are recoverable "under a jury verdict approach" (app. reply br. at 10).

For its part, the Navy derides Alderman's argument as "lacking any basis in case law, regulation or fact" (gov't br. at 22). The Navy points out that these costs rest upon a calculation by Dr. Seals, who constructed an "equivalent hourly rate" calculation that we do not accept as within Dr. Seals' expertise (findings 15, 39; gov't br. at 22-23). In addition, we do not accept Alderman's alternate argument regarding the use of a jury verdict to recover these costs. In *Dawco Construction*, *Inc. v. United States*, 930 F.2d 872, 882 (Fed. Cir. 1991) (*overruled on other grounds by Reflectone*, *Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995) (*en banc*)), the court of appeals set out the criteria for applying the jury verdict method:

20

(1)  [T]hat clear proof of injury exists; (2) that there is no
more reliable method of computing damages; and (3) that the
evidence is sufficient for a court to make a fair and
reasonable approximation of the damages.

On this record, we cannot conclude that Alderman has made the requisite showing to justify resort to the jury verdict method.

We accordingly deny the alleged direct costs of standby and deduct this item from the amount due Alderman.

F. *Amount of Award*

As indicated, we deduct the amount of the alleged direct costs of standby from Alderman's claim of $56,548 (*see* finding 12), leaving a net recoverable amount of $34,795.  Alderman is entitled to recover this amount, plus interest under the Contract Disputes Act, 41 U.S.C. §§ 7101-7109, from August 24, 2011 until paid (*see* finding 12).

CONCLUSION

The appeal is sustained in part to the extent indicated and is otherwise denied.

Dated:  May 21, 2020

ALEXANDER YOUNGER
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

21

I concur                                          I concur


RICHARD SHACKLEFORD                    J. REID PROUTY
Administrative Judge                          Administrative Judge
Acting Chairman                                Vice Chairman
Armed Services Board                         Armed Services Board
of Contract Appeals                            of Contract Appeals


I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58082, Appeal of Alderman Building Company, Inc., rendered in conformance with the Board's Charter.

Dated: May 21, 2020


PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals